# Exhibit A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re WARFARIN SODIUM ANTITRUST LITIGATION | ) ) ) ) | |
| This document relates to: All Actions. | ) ) ) | MDL No. 98-1232-SLR |

---

Pamela Tikellis, Esquire and Robert J. Kriner, Jr., Esquire of Chimicles & Tikellis LLP, Wilmington, Delaware.  Counsel for Plaintiff.  Of Counsel: Bernard Perksy, Esquire, Barbara J. Hart, Esquire, and Vaishali Shetty, Esquire of Goodkind Labaton Rudoff & Sucharow LLP, New York, New York; Marvin A. Miller, Esquire, Patrick E. Cafferty, Esquire, and Jennifer W. Sprengel, Esquire of Miller Faucher and Cafferty LLP, Chicago, Illinois; Susan Salvetti, Esquire of Zwerling, Schachter & Zwerling, LLP, New York, New York; Stephen Lowey, Esquire, Richard W. Cohen, Esquire, and Geoffrey M. Horn, Esquire of Lowey Dannenberg Bemporad & Selinger, P.C., White Plains, New York; and Joseph Arshawsky, Esquire of Provost Umphrey L.L.P and Youngdahl Sadin, P.C., Albuquerque, New Mexico.

Donald J. Wolfe, Jr., Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware.  Counsel for Defendant.  Of Counsel: Adam L. Hoeflich, Esquire of Bartlit Beck Herman Palenchar & Scott, Chicago, Illinois; and George D. Ruttinger of Crowell & Moring LLP, Washington, D.C.

John B. Scott, Esquire and Andrew W. Yung, Esquire of Scott Yung LLP, Dallas, Texas.  Counsel for Objector Health Care Service Corporation.  W. Scott Simmer, Esquire and Thomas J. Poulin, Esquire of Porter, Wright, Morris & Arthur, LLP, Washington, DC. Counsel for Objector Trigon Blue Cross Blue Shield et al.  R. Stephen Griffis, Esquire, Charles M. Thompson, Esquire, Kearney Dee Hutsler, Esquire, Birmingham, Alabama.  Counsel for Objector Jean Bradley et al.  Edward W. Cochran, Esquire, Shaker Heights, Ohio.  Counsel for Objector Shirley Bruce.  J. Arnold Fitzgerald, Esquire, Dayton, Tennessee.  Counsel for Objector Mary L. Cleusman et al.  Paul D. Wexler, Esquire of Bragar Wexler Eagler & Morgenstern, LLP, New York, New York.  Counsel for Objector Seymour Eagel.  Paul S. Rothstein, Esquire, Gainesville, Florida. Counsel for Objector Alexander Galperin.  Jean Marie Hansen, Esquire and David W. Wright, Esquire, Bloomfield Hills, Michigan. Counsel for Objector Kenard C. Hansen.  N. Albert Bacharach, Jr., Esquire, Gainesville, Florida.  Counsel for Objectors Willie

8/30/02

Hutchinson, Jr. and Vincent Palazzola.  Robert W. Bishop, Esquire
of Bishop & Assoc., PSC, Louisville, Kentucky.  Counsel for
Objector Garey L. McCarty.  Frank H. Tomlinson, Esquire of
Pritchard McCall & Jones, LLC, Birmingham, Alabama.  Counsel for
Objector Madison W. O'Kelley, Jr.  John J. Pentz, Esquire of The
Objectors Group, Sudbury, Massachusetts.  Counsel for Objector
Alan Shapiro.

---

**OPINION**

Dated: August 30 , 2002
Wilmington, Delaware

ROBINSON, Chief Judge

## I.    INTRODUCTION

On March 30, 2001, consumers and third-party payors ("TPPs")
who paid all or part of the purchase price of Coumadin® warfarin
sodium[1] filed a consolidated class action complaint alleging,
individually and on behalf of all others similarly situated, that
defendant DuPont Pharmaceuticals Company[2] ("DuPont") caused them
to overpay for Coumadin as a result of defendant's
anticompetitive behavior and dissemination of false and
misleading information about Coumadin and its generic competitor.
(D.I. 163)  Plaintiffs alleged violations of federal and state
antitrust statutes, the Delaware Consumer Fraud Act (6 Del. C. §
2513), and the consumer fraud and deceptive acts and practices
statutes of the fifty states and the District of Columbia.
Plaintiffs also claimed tortious inference with contract on
behalf of the TPPs and unjust enrichment on behalf of the entire
class.

In the motions at bar, plaintiffs seek the court's final
approval of a proposed class action settlement agreement (D.I.
233) and seek an award of attorneys' fees and expenses (D.I.

---

[1]Coumadin® is the brand name for the prescription drug
warfarin sodium, as manufactured and marketed by defendant.
Warfarin sodium is prescribed for the prevention and treatment of
blood clotting disorders.  (D.I. 163 at ¶ 1)

[2]Formerly known as DuPont Merck Pharmaceutical Company (a
partnership between E.I. duPont de Nemours & Company and Merck &
Company).

235).  For the reasons that follow, the court shall grant
plaintiffs' motion for final approval of the settlement and award
attorneys' fees in the amount of 22.5% of the Settlement Fund and
expenses in the amount of $832,382.84.

## II.    BACKGROUND

### A.    Litigation History

The proposed settlement resolves related class actions in
both federal and state courts.  The course of this litigation is
relevant to determining the fairness of the settlement and the
reasonable attorneys' fees and expenses, thus a brief history is
set forth below.

### 1.    Federal Court Actions

In December 1997, two consumer class actions, <u>Kusnerik v.
DuPont Merck Pharmaceutical Company</u>, C.A. No. 97-659-SLR, and
<u>Altman v. DuPont Merck Pharmaceutical Company</u>, C.A. No. 97-670-
SLR, were filed in this court.  The actions sought treble damages
and injunctive relief under federal antitrust law on behalf of a
nationwide class of indirect purchasers of Coumadin. By a
February 9, 1998 order, the court consolidated the <u>Kusnerik</u> and
<u>Altman</u> actions under the caption <u>In re Warfarin Sodium Antitrust
Litigation</u>, C.A. No. 97-659-SLR.  (D.I. 237 at ¶ 6)

In January 1998, another consumer class action was filed in
the Southern District of Florida, <u>Tischler v. DuPont Merck</u>

2

Pharmaceutical Company, C.A. No. 1:98-178.  Plaintiffs in

Tischler sought damages and injunctive relief under federal

antitrust law, the Florida Deceptive and Unfair Trade Practices

Act, and other state consumer protection laws.  (Id. at ¶ 11)   A

fourth consumer class action, Steckel v. DuPont Merck

Pharmaceutical Company, C.A. NO. 98-697, was filed in the Western

District of Pennsylvania in April 1998.  The Steckel plaintiffs

alleged violations of federal antitrust law and sought damages

and injunctive relief.  (Id. at ¶ 14)

Pursuant to a motion filed by counsel in the Kusnerik/Altman

action, the Panel on Multi-District Litigation (the "MDL panel")

transferred the Tischler and Steckel actions to this court in

June 1998 for coordination of pretrial proceedings under MDL No.

98-1232-SLR.  (Id. at ¶ 17)

Even prior to the MDL order, plaintiffs' counsel had engaged

in negotiations with defendant to reach agreement on

confidentiality orders, discovery, and scheduling.  (Id. at ¶¶ 9,

16, 19)  Eventually the court entered a scheduling order for

completion of fact and expert discovery, and plaintiffs' counsel

began preparing discovery requests.  (Id. at ¶ 24)  In response

to discovery requests in various related federal and state

actions, defendant produced approximately 447 boxes of documents,

which were made available to all plaintiffs' counsel at a

document depository that defendant established and maintained in

Maryland. (<u>Id.</u> at ¶ 26) Plaintiffs' counsel in the federal and state actions informally coordinated their efforts in reviewing and analyzing the voluminous documents produced by defendant. (<u>Id.</u>)

During this time, plaintiffs also worked extensively with an expert in preparation for filing a motion for class certification. (<u>Id.</u> at ¶ 27) Before plaintiffs filed the motion, their expert terminated his work with them because he had moved to a consulting firm that was then representing defendant in the matter. (<u>Id.</u>) Plaintiffs filed a motion to disqualify the consulting firm.

In October 1998, plaintiffs filed a joint motion for class certification to certify a nationwide class of Coumadin indirect purchasers and to appoint class counsel. (<u>Id.</u> at ¶ 28)

In December 1998, the court granted defendant's motion to dismiss the <u>Kusnerik</u>, <u>Altman</u>, <u>Tischler</u>, and <u>Steckel</u> actions. (D.I. 98) Plaintiffs appealed the portion of the court's judgment which had dismissed their claim for injunctive relief under the federal antitrust laws. (D.I. 237 at ¶ 29) On May 30, 2000, the Third Circuit reversed and remanded the court's decision with respect to injunctive relief, finding the consumer plaintiffs had standing under federal antitrust law. <u>In re Warfarin Sodium Antitrust Litigation</u>, 214 F.3d 395 (3d Cir. 2000).

4

Following remand of the <u>Kusnerik</u>, <u>Altman</u>, <u>Tischler</u>, and <u>Steckel</u> actions, several additional class actions were filed in this court and other federal courts by TPP plaintiffs and by a state medicaid agency. In <u>United Wisconsin Services, Inc. v. DuPont Pharmaceutical Company</u>, C.A. No. 00-979-SLR, plaintiffs asserted claims based on federal antitrust law and state deceptive acts and practices and consumer protection laws on behalf of a nationwide class of TPPs. (D.I. 237 at ¶ 34) A separate action was filed in this court in December 2000 on behalf of a nationwide class of TPPs alleging violations of federal and state antitrust laws as well as state consumer protection laws. <u>Arkansas Carpenters' Health & Welfare Fund et al. v. DuPont Pharmaceutical Company</u>, C.A. No. 00-1035-SLR. (<u>Id.</u> at ¶ 35)

In July 2000, a class action was filed in the Middle District of Louisiana on behalf of a nationwide class of TPPs. <u>Louisiana Health Svcs. and Indemnity Company v. DüPont Pharmaceuticals, Inc.</u>, C.A. No. 00CV538C-Z. The action alleged unlawful and anticompetitive acts by defendant in violation of, among other things, the Clayton Act, the Robinson-Patman Act, and the Lanham Act. The action was transferred to this court as a tag-along action pursuant to the earlier MDL order. (D.I. 237 at ¶ 36)

5

The Alabama Medicaid Agency and the State of Louisiana, through its Department of Health and Hospitals, filed a complaint against defendant in the Southern District of Alabama, Southern Division, in May 2000.  Alabama Medicaid Agency et al. v. DuPont Pharmaceutical, Inc. et al., C.A. No. 00-0420-BH-L.  Plaintiffs alleged violations of federal antitrust laws and the state fraudulent misrepresentation statute.  The case was also transferred to this court as a tag-along action to the MDL order. (Id. at ¶ 37)

After numerous discussions among consumer and TPP counsel and, subsequently, defendant's counsel, the parties negotiated and drafted a proposed pre-trial case management order that would establish a formal plaintiffs' Executive Committee, establish procedures for conducting settlement discussions, and specify how and when to file a consolidated class action complaint.  (D.I. 237 at ¶ 40)  On February 22, 2001, this court entered the case management order and consolidated the Tischler, Steckel, Arkansas Carpenters, and United Wisconsin actions with the previously consolidated Kusnerik and Altman actions.[3]  (D.I. 159)  The Louisiana Blue Cross action was added after its transfer to this court.  (Civ. No. 01-124, D.I. 7)  A consolidated class action complaint was filed on March 30, 2001.  (D.I. 163)

---

[3]The Alabama Medicaid case continued to be coordinated, but not consolidated, with the other cases.

As specified by the case management order, plaintiffs' counsel formed an Executive Committee consisting of the following members: Goodkind Labaton Rudoff & Sucharow LLP (co-chair for all plaintiffs); Miller Faucher and Cafferty LLP (co-chair for all plaintiffs); Zwerling, Schachter & Zwerling, LLP (consumer counsel); Lowey Dannenberg Bemporad & Selinger, P.C. (TPP counsel); and Youngdahl & Sadin, P.C. (TPP counsel). (D.I. 159 at 7) The co-chairs of the Executive Committee were assigned primary responsibility for, among other things, motions, discovery, negotiations with defendant, and acting as spokespersons at pretrial conferences. (Id. at 7-8) While the co-chairs had primary responsibility for negotiations, any settlement discussions had to be attended by at least one of the co-chairs, one consumer representative, and one TPP representative; no settlement offer could be made or accepted without the prior consent of all the consumer and TPP representatives on the committee. (Id. at 8)

## 2. State Litigation

Certain plaintiffs' counsel pursued related class actions in various state courts:

- Shirley Ricks Freeman, Walter R. Goldstein and Andrew D. Baugus v. DuPont Merck Pharmaceutical Company, CV-98-58, Circuit Court of Lauderdale County, Alabama ("Baugus action")

7

- _Wilkinson v. E.I. duPont de Nemours & Co., Merck & Co., DuPont Merck Pharmaceutical Co._, C.A. No. 3:98-440, Chancery Court of the State of Tennessee, 20th District, Davidson County ("Wilkinson action")

- _Newman v. DuPont Merck Pharmaceutical Company_, No. 788358, California Superior Court, Orange County ("Newman action")

- _Brahm v. E.I. duPont de Nemours & Co., Merck & Co., and the DuPont Merck Pharmaceutical Co._, No. 719668, California Superior Court, San Diego County ("Brahm action")

- _Ambler v. DuPont Merck Pharmaceutical Co._, No. BC189002, California Superior Court, Los Angeles County ("Ambler action")

- _Kruse v. DuPont Merck Pharmaceutical Company_, No. 97 CH 15799, Illinois Circuit Court, Cook County ("Kruse action")

- _Dean Health Plan, Inc. v. DuPont Merck Pharmaceutical Co._, Case No. 00CV2357, State of Wisconsin, Dane County ("Dean Health Plan action")

- _Krausman v. DuPont Pharmaceuticals Company_, Index No. 49030/00, New York State Supreme Court, New York County ("Krausman action")

The state actions that are still pending, specifically, the _Kruse_, _Newman_, _Wilkinson_, _Krausman_, and _Dean Health Plan_ actions, are included in the proposed settlement.

In the _Kruse_ action, filed in December 1997, plaintiff sued on behalf of a nationwide Coumadin consumer class, alleging violations of the Illinois Consumer Fraud Act and similar

8

statutes in other states.  (D.I. 237 at ¶ 43)  After surviving motions to remove the case to federal court and motions to dismiss, the case eventually proceeded to discovery and class certification.  Plaintiff's counsel served and responded to document requests and interrogatories and engaged in extensive review of documents produced by defendant.  Plaintiff's and defendant's counsel deposed several witnesses, including expert witnesses for each side.  After briefing and a hearing on plaintiff's motion for class certification, in June 2000 the court certified a nationwide class of Coumadin indirect purchasers, appointed plaintiff Kruse as class representative, and designated the firms of Goodkind Labaton Rudoff & Sucharow LLP and Miller Faucher and Cafferty LLP as class counsel.  After certification of the consumer class, several TPPs sought to intervene on behalf of a class of TPPs.  Before the motions to intervene could be resolved, defendant successfully applied to the Illinois Supreme Court for a stay in the proceedings pending the disposition of another Illinois Supreme Court case involving potentially dispositive issues relating to the Illinois Consumer Fraud Statute.  (Id. at ¶¶ 43-69)

The Newman action in California state court was filed in December 1997 as a multistate class action under state antitrust and consumer protection laws.  In the trial court, plaintiffs successfully defended against defendant's motion to strike the

9

complaint as a so-called "SLAPP suit"[4] and against a motion to dismiss.  Plaintiffs' counsel conducted and defended several depositions, conducted written discovery, and participated in document discovery at the document depository in Maryland. Subsequently, defendant appealed the SLAPP suit decision to the California Supreme Court; eventually the trial court decision was vacated and the issue was remanded to the trial court for further consideration.  (Id. at ¶¶ 70-83)  Defendant also sought stay or dismissal of the Newman action on the basis of a settlement in another statewide antitrust class action which defendant claimed estopped the Newman action.  After a hearing, the motion was denied.  An appeal is currently stayed.  (Id. at ¶¶ 97-99)

The Ambler plaintiffs filed a multistate class action in April 1998 alleging violations of state antitrust and consumer protection laws, as well as common law claims for fraud and deceit, negligent misrepresentation, and negligence.  (Id. at ¶¶ 84-85)  The Brahm plaintiffs brought a similar class action on behalf of consumers in 13 jurisdictions, including California. (Id. at ¶¶ 87-89)  The Brahm and Ambler plaintiffs jointly petitioned the Judicial Council of the State of California to coordinate the Brahm, Ambler, and Newman actions, and the petition was granted after a hearing on the petition.  (Id. at ¶¶

---

[4]"SLAPP" is a Strategic Lawsuit Against Public Participation.

10

86, 91-96)   Defendant filed a motion to strike the <u>Brahm</u>
complaint as a SLAPP suit and, after briefing and argument, the
complaint was dismissed.   (<u>Id.</u> at ¶¶ 88-89)

   In Alabama, the <u>Baugus</u> plaintiffs' filed a class action in
February 1998 on behalf of Alabama consumers of Coumadin,
pursuant to Alabama antitrust statutes.   Plaintiffs pursued
document discovery and spent many months reviewing voluminous
documents in Alabama and the document depository established by
defendant in Maryland.   Defendant filed a motion for summary
judgment alleging its acts fell outside the reach of Alabama
antitrust statutes, which were wholly limited to intrastate
commerce.   The court granted defendant's motion, and the Supreme
Court of Alabama affirmed the decision on appeal.   (<u>Id.</u> at ¶¶
100-108)

   In April 1998, the <u>Wilkinson</u> plaintiffs filed a class action
suit in Tennessee state court alleging violation of the Tennessee
Consumer Protection Act and similar consumer protection statutes
in 45 other states.   Defendant removed the action to federal
court and sought its transfer to the District of Delaware, but
the Tennessee district court remanded it back to the state.
Defendant subsequently filed a motion a dismiss, which was denied
with the exception of one count that was dismissed.   Plaintiffs
filed a motion for class certification and, after extensive
discovery and oral argument before the court, the motion was

denied.  Plaintiffs have since filed an amended complaint
alleging violations of the antitrust laws of sixteen
jurisdictions as well as the Tennessee Consumer Protection Act.
(Id. at ¶¶ 109-116)  In a related action in the District of
Columbia, the target of a document and deposition subpoena served
by the Wilkinson plaintiffs filed a motion for a protective
order, seeking to quash or modify the deposition subpoena.  The
court denied the motion, and the movant there has appealed.  (Id.
at ¶¶ 117-119)

In Wisconsin in August 2000, the Dean Health Plan health
maintenance organization filed a class action on behalf of
consumers or entities who had purchased Coumadin not for resale,
alleging violation of Wisconsin antitrust statutes.  (Id. at ¶¶
120-122)  Finally, in December 2000, the Krausman plaintiffs
filed a class action on behalf of consumer purchasers of Coumadin
under the New York antitrust and consumer protection statutes.
(Id. at ¶¶ 123-125)

## B.    Consolidated Complaint

A consolidated class action complaint was filed in this
court on March 30, 2001 by consumer[5] and TPP[6] plaintiffs on

---

[5]The named consumer plaintiffs are John Kusnerik, a resident
of New Jersey; Sara Altman, a resident of New York; Samuel Gordon
Tischler, a resident of Florida; and Marie A. Steckel, a resident
of Pennsylvania.  (D.I. 163 at ¶ 16)  Each claims to have
purchased Coumadin during the class period at supracompetitive

12

behalf of all similarly situated United States consumers who
purchased Coumadin at supracompetitive prices and all similarly
situated United States TPPs who paid for the fulfillment of their
members' or insureds' prescriptions for Coumadin at
supracompetitive prices beginning on July 28, 1997.  (D.I. 163 at
¶¶ 2)  Plaintiffs sought an injunction and other equitable relief
pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to
enjoin and prevent defendant's violation of the federal antitrust
laws, particularly Section 2 of the Sherman Act, 15 U.S.C. § 2.
(Id. at ¶ 3)  On behalf of all TPPs,[7] plaintiffs sought treble
damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

---

prices.

[6]The named TPP plaintiffs are Arkansas Carpenters' Health &
Welfare Fund, a trust fund and employee benefit plan with its
principal place of business in North Little Rock, Arkansas;
Operating Engineers Local 312 Health & Welfare Fund, a trust fund
and employee benefit plan with its principal place of business in
Birmingham, Alabama; United Food and Commercial Workers Union and
Employers Midwest Health Benefits Fund, a trust fund and employee
benefit plan with its principal place of business in Park Ridge,
Illinois; United Wisconsin Services, Inc., a Wisconsin
corporation with its principal place of business in Milwaukee,
Wisconsin that provides managed health cares services to more
than 1.9 million people in 49 states through its various
subsidiaries and affiliates; and Louisiana Health Services and
Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana,
a Louisiana corporation with its principal place of business in
Baton Rouge, Louisiana that provides health and medical services
and supplies to more than 750,000 people.

[7]Plaintiffs were barred from seeking treble damages on
behalf of consumer plaintiffs due to this court's earlier
dismissal of consumer damage claims under the federal antitrust
laws.  (D.I. 98)

13

(<u>Id.</u> at ¶ 4)  Plaintiffs also alleged violations of the Delaware Consumer Fraud Act, 6 Del. C. § 2513; the consumer fraud and deceptive acts and practices statutes of the fifty states and the District of Columbia; and the antitrust statutes[8] of the "Indirect Purchaser" states.  (<u>Id.</u> at ¶¶ 5-7)  In addition, plaintiffs alleged tortious interference with TPPs' contracts or agreements with health benefit plan members and pharmacies relating to the substitution of generic warfarin sodium and alleged unjust enrichment under the laws of all fifty states and the District of Columbia.  (<u>Id.</u> at ¶¶ 8-9)

In the complaint, plaintiffs accused defendant of disseminating false and misleading information to consumers, TPPs, and others about generic versions of warfarin sodium. Defendant allegedly disseminated information claiming generic warfarin sodium was not bioequivalent or therapeutically

---

[8]Arizona Revised Statutes §§ 44-1401, <u>et seq.</u>; California Business and Professions Code §§ 17200 <u>et seq.</u>; District of Columbia Antitrust Act of 1980, D.C. Code §§ 28-4502, <u>et seq.</u>; Chapter 401, Part II, Florida Statutes; Kansas Statutes Annotated §§ 50-101, <u>et seq.</u>; Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. §§ 367.110-310, <u>et seq.</u>; Louisiana Revised Statutes §§ 51:137, <u>et seq.</u>; Maine Revised Statutes Annotated, 10 M.R.S.A. §§ 1101, <u>et seq.</u>; <u>Massachusetts Ann. Laws, Ch. 93A, et seq.;</u> Michigan Antitrust Reform Act, MCL §§ 445.771, <u>et seq.</u>; Minnesota Antitrust Act of 1961, Minn. Stat. §§ 325D.49, <u>et seq.</u>; New Jersey Stat. Ann., N.J.S.A. §§ 56:9-1, <u>et seq.</u>; N.M. Stat. Ann. §§ 57-1-1, <u>et seq.</u>; New York General Business Law §§ 340, <u>et seq.</u>; North Carolina Gen. Stat. §§ 75-1, <u>et seq.</u>; North Dakota Cent. Code §§ 51-08.1-0, <u>et seq.</u>; South Dakota Codified Laws Ann. §§ 37-1, <u>et seq.</u>; Tenn. Code Ann. §§ 47-25-101, <u>et seq.</u>; West Virginia Code, W. Va. Code §§ 47-18-1, <u>et seq.</u>; Wisconsin Stat. §§ 133.01, <u>et seq.</u>

14

equivalent to Coumadin, thus creating a climate of fear that discouraged the use of generic warfarin sodium and caused millions of prescriptions to be filled with Coumadin that could and would have been filled with less expensive generic warfarin sodium. (Id. at ¶ 11)

Plaintiffs made the following factual allegations in the complaint. Warfarin sodium is a prescription oral anticoagulant medication sold in tablet form that is taken by more than 2 million Americans to treat blood clotting disorders. Until July 1997, defendant's brand name version of warfarin sodium, Coumadin, was the only warfarin sodium tablet available. (Id. at ¶ 29) Although defendant lost its patent protection for Coumadin in 1962, it was able to continue monopolizing the market for warfarin sodium and, between 1987 and 1997, raised the price of Coumadin by more than 400 percent. (Id. at ¶¶ 32-33) In 1998 and 1999, defendant's annual sales of Coumadin were approximately $550 million and $464 million respectively. (Id. at ¶ 28)

In March 1997, the FDA approved Barr's generic warfarin sodium product, concluding that the generic warfarin sodium was bioequivalent and, therefore, therapeutically equivalent to Coumadin.[9] (Id. at ¶ 43) Barr introduced its generic warfarin

---

[9]Generic drug manufacturers can obtain approval from the FDA to market generic drugs by submitting detailed information proving that the generic version is equivalent to the previously approved brand name version. Bioequivalence is demonstrated by

sodium product to the market on July 26, 1997 at prices substantially lower than Coumadin. (Id. at ¶ 49)

Defendant allegedly published false and misleading statements concerning the bioequivalence, therapeutic efficacy, and safety of generic warfarin sodium to help it maintain its monopoly position in the face of generic competition. The purpose of these statements was to deter doctors, pharmacists, TPPs, and consumers from switching to the generic drug despite the FDA's findings that the generic was bioequivalent and therapeutically equivalent to Coumadin. (Id. at ¶ 40)

As a specific example, in the days and months before and after introduction of Barr's generic warfarin sodium, defendant repeatedly claimed in press releases and promotional brochures targeted at doctors that additional blood tests and monitoring had to be done when interchanging Coumadin with a generic substitute. (Id. 49-51, 54) This warning was repeated directly to patients who called an "800" telephone number in response to full-page newspaper advertisements (id. at ¶ 52) and in a facsimile addressed to 45,000 pharmacists in October 1997 (id. at

---

showing that the generic drug delivers to the body the same amount of active ingredient at the same rate and extent as its brand name counterpart. Once bioequivalence is established and the FDA approves the manufacturing controls and labeling of the generic substitute, the FDA grants approval for release of the generic drug to the market and assigns an "AB" rating. (Id. at ¶ 34-35)

16

¶ 57).  Plaintiffs also alleged that a press release issued within days after Barr's generic was introduced implied that the cheaper generic substitute sacrificed patient safety to focus on cost.  (Id. at ¶ 50)

On August 26, 1997, the FDA sent a letter to defendant warning that certain statements made by defendant with regard to Coumadin and generic warfarin sodium were false and/or misleading under the Federal Food, Drug, and Cosmetic Act and FDA regulations.  (Id., Ex. 1)  The FDA objected to a slide presentation that "stated or suggested generic drug products, such as warfarin, that have been shown to be bioequivalent to a reference drug (Coumadin) and approved as such by FDA may not be therapeutically equivalent."  (Id.)  It also found statements made in a March 1997 press release and in several promotional brochures – claiming that additional blood testing and monitoring were required if a patient was switched to another warfarin sodium product – were misleading.  (Id.)  The FDA cautioned that these statements, based on previously approved Coumadin product labeling, applied to other, non-bioequivalent warfarin products (such as warfarin potassium) no longer available in the marketplace.  To use these statements in reference to bioequivalent and therapeutically equivalent products was misleading.  In a follow-up letter on January 5, 1998, the FDA reaffirmed its position and indicated the "seriousness with which

17

we regard DuPont's false and misleading promotion of Coumadin."
(Id., Ex. 2)  The FDA also commented that the offending
activities had continued after the August 1997 FDA letter.

Defendant also allegedly revised its promotional and
educational "CoumaCare" initiative following the launch of Barr's
generic substitute.  The revised program included false and
misleading assertions and innuendoes about problems that patients
could have as a result of slight variations in drug dosage and
encouraged doctors and pharmacists to minimize risk by not
substituting generics for branded drugs.  (Id. at ¶ 41)

Plaintiffs further alleged that, through financial and other
incentives, defendant induced large pharmacy and drugstore chains
to dispense Coumadin rather than its less expensive generic
substitute.  (Id. at ¶ 62)  Another allegation was that defendant
misrepresented generic warfarin sodium as it engaged in a wide-
ranging campaign to persuade state agencies and legislatures to
restrict the sale and substitution of generic warfarin. (Id. at ¶
59-60)

Finally, plaintiffs cited a DuPont press release about
supposedly "spontaneous and unsolicited" reports of adverse drug
reactions associated with patients who had switched from Coumadin
to the generic equivalent.  (Id. at ¶ 64)  Defendant later
admitted that it had solicited many of these reports.  Plaintiffs
asserted that the adverse events were similar to adverse events

reported to the FDA about Coumadin itself, and thus it was
misleading for defendant to imply a causal link between switching
to a generic and the adverse events. (Id. at ¶¶ 65)

As evidence that defendant's misrepresentations had their
desired effect, plaintiffs cited the weak market penetration of
generic warfarin sodium. Generally, about 40-70% of
prescriptions for drugs available from multiple sources are
filled with less expensive generics within one year of generic
availability. (Id. at ¶ 70) However, more than 75% of
prescriptions for sodium warfarin were still filled with Coumadin
a year after Barr introduced its generic version, and DuPont
continued to maintain a 67% market share up until the date the
complaint was filed. (Id.) Plaintiffs also asserted that some
pharmacies, including some large chains, refused to substitute
the generic for Coumadin out of a mistaken belief that generic
warfarin sodium was not equivalent to Coumadin. (Id. at ¶ 58)
The reports of adverse events disseminated by defendant caused at
least one physician's group to instruct their patients to take
only brand name Coumadin. (Id. at ¶ 67)

Plaintiffs alleged this unlawful conduct "arose, was
directed and emanated from Delaware" to the detriment of class
members throughout the United States. (Id. at ¶ 96)

19

C.    **Settlement Negotiations and Stipulation of Settlement and Compromise**

Settlement negotiations in the federal actions began in March 2000 and continued through the next year.  (D.I. 237 at ¶¶ 133, 135)   In the course of negotiations, plaintiffs consulted with an economic expert to prepare a damages analysis.  (Id. at ¶ 134)   Plaintiffs' damages analysis "sharply conflict[ed]" with that of the defense.  (Id. at ¶ 135)   Nevertheless, after TPPs got involved in negotiations, an oral agreement in principle to the basic terms of a settlement was reached on April 19, 2001 and a memorandum of understanding was executed by all parties on May 14, 2001.  (Id. at ¶ 136)   After spending a substantial amount of time negotiating and finalizing the formal, detailed terms of the settlement, the parties entered into a Stipulation of Settlement and Compromise on July 26, 2001.  (Id. at ¶ 137)

The proposed settlement provides for defendant to pay $44.5 million to settle the claims of the following class to be certified for settlement purposes only:

> All consumers and Third Party Payors in the
> United States who purchased and/or paid all
> or part of the purchase price of Coumadin
> dispensed pursuant to prescriptions in the
> United States during the period March 1, 1997
> through and including August 1, 2001 ("Class
> Period").   Excluded from the Class are
> Defendant and any of its officers and
> directors, and any governmental entity.
> "Third Party Payor" shall mean any non-

20

> governmental entity that is (i) a party to a
> contract, issuer of a policy, or sponsor of a
> plan, which contract, policy or plan provides
> prescription drug coverage to natural
> persons, and is also (ii) at risk, pursuant
> to such contract, policy or plan, to provide
> prescription drug benefits, or to pay or
> reimburse all or part of the cost of
> prescription drugs dispensed to natural
> persons covered by such contract, policy, or
> plan.

(Id. at ¶ 5)  Upon final approval of the settlement, all pending

actions against defendant arising from its alleged unlawful

marketing and sale of Coumadin (both federal MDL proceedings and

related state actions) would be dismissed.  Defendant has already

paid $44.5 million into an escrow account which is earning

interest for the benefit of the class.  (Id.)

Under the allocation and distribution plan negotiated

between the consumer counsel representative and the TPP counsel

representatives on the Executive Committee, the Net Settlement

Fund[10] will be distributed to class members who have filed a

Proof of Claim on or before April 30, 2002.  (Id. at ¶ 138)  The

"recognized loss" for each class member will be total payments

made for Coumadin (less the amounts received for reimbursements,

discounts or rebates) multiplied by 15%.  Eighteen percent of the

Net Settlement Fund is to be set aside as a "Preferential Fund"

---

[10]The Net Settlement Fund will be calculated as follows:
$44.5 million plus interest, less court-awarded attorneys' fees,
costs and expenses, less costs of notice to class members, less
costs of administering the fund; and less taxes.  (D.I. 172 at 6)

out of which the recognized losses of consumers will be paid. If the total recognized losses of consumers are not fully satisfied out of the Preferential Fund, the unsatisfied amounts will be paid from the remainder of the Net Settlement Fund on a pro-rata basis with TPP claimants. If the recognized losses of consumers are fully satisfied from the Preferential Fund and money remains in that fund, the unexpended portion will be added to the Net Settlement Fund for payment of the recognized losses of TPPs. (D.I. 237 at ¶ 139)

As a condition of the settlement, plaintiffs and class members agree to release any legal, equitable, or administrative claims against defendant "that relate to the marketing, promotion or sale of Coumadin during the Class Period that were or could have been asserted" in the instant Coumadin litigation. (D.I. 172 at 7, 20-22) "To the extent permitted by applicable law," the class members also waive and release any "provisions, rights and benefits conferred by § 1542 of the California Civil Code [or other similar state or common law]," which states that a general release does not extend to claims which the creditor does not know or suspect to exist at the time the release is executed, if the knowledge would have "materially affected his settlement with the debtor." (Id. at 21-22) Excluded from the released claims are any claims for physical or bodily injury or defective products arising from the use or purchase of Coumadin; any claims

22

that Coumadin is not safe or effective; and any breach of
contract claims between defendant and TPPs that are unrelated to
the current false and/or misleading information claims.  (<u>Id.</u> at
8)

The stipulation of settlement is also conditioned on final
approval of the settlement by the court without material
modification.  (<u>Id.</u> at 19)

## D.    Preliminary Approval

On August 1, 2001, the court granted preliminary approval of
the settlement and conditionally certified the settlement class.
(D.I. 177)  The order approved the plan for providing notice to
the class members about the settlement terms and required class
members to exclude themselves from the class ("opt out") by
December 17, 2001.  The court also required any class members who
wished to object to the proposed settlement, but had chosen not
to opt-out, to file a written statement of objection by December
17, 2001.  Class members who wanted to file a claim were given
until April 30, 2002 to file the appropriate Proof of Claim.  A
settlement hearing ("fairness hearing") was scheduled for January
23, 2002.

The court approved the Proof of Claim forms for consumers
and TPPs on August 17, 2001.  (D.I. 181)

23

## E.    Notice to Class and Response

Plaintiffs contracted with a nationally recognized settlement administrator, Complete Claim Solutions, Inc. ("CCS"), to prepare and implement a notice program.   (D.I. 237 at ¶ 142) After the court approved the program, CCS published notice targeted at both consumer and TPP class members; set up a call center to receive telephone inquiries; prepared, printed, and distributed notice packets for consumers and TPPs who responded to the notice; and designed and developed a website for class members to review and access information about the settlement. (D.I. 237, Ex. C)   Summary notice of the proposed settlement was published over a period of three months beginning in August 2001 in selected publications throughout the country, including USA Today, USA Weekend, and Parade magazine; newspapers in the top twelve United States markets for adults over the age of 50; and widely circulated magazines such as Modern Maturity and Readers Digest.   (D.I. 237 at ¶ 145; Ex. C at ¶ 5, Young Affidavit)   The publications have a combined circulation of approximately 115 million people.   The notice was also published in National Underwriter and Benefits and Compensation Solutions.   (D.I. 237 at ¶ 145)

The summary notice informed class members that a settlement on behalf of the class had been proposed and included the following information:

24

- Case caption;

- Settlement amount of $44.5 million plus interest;

- Date, time, and place for fairness hearing;

- Class description;

- Nature of litigation claims, i.e., that defendant had disseminated false and misleading information regarding the bioequivalence of Coumadin and other warfarin sodium products and had induced pharmaceutical distributors to favor Coumadin over other warfarin sodium products;

- Address and telephone number from which class members could obtain more detailed information about the settlement and their rights to participate in or object to the settlement;

- Deadline for receipt of Proof of Claim;

- Website address;

- Notice that class members who did not ask to be exluded would be bound by the final order and judgment entered by the court; and

- Deadline for exclusion from the final order and judgment, i.e., opt-out deadline.

(Id., Ex. C at ¶ 5, Young Affidavit)

25

Separate notice packets were developed for consumers and TPPs. (<u>Id.</u>, Ex. C at ¶ 2)  The notice packets included a full written notice of the proposed settlement, a Notice of Exclusion form, and a consumer or TPP Proof of Claim form. (<u>Id.</u>)  CCS sent the TPP notice packet to 12,707 potential TPPs using first class mail. (<u>Id.</u>, Ex. C at ¶¶ 3-4)  Additional notice packets were mailed to consumer and TPP class members as requests were received by the claims administrator.

In addition to the same information provided in the summary notice, the full notice of the settlement included:

•   Description of the litigation and the claims and defenses raised by the parties;

•   Terms of the proposed settlement, including how to review a copy of the complete Stipulation of Settlement and Compromise;

•   Description of the allocation and distribution plan;

•   Explanation of the right to opt out of the class, how to file a Notice of Exclusion, and the consequences of opting out;

•   Identification of counsel appointed as co-chairs of the Executive Committee;

26

- Scope of claims release and dismissal of litigation;

- Description of fairness hearing and how to participate;

- Procedure for submitting written and/or oral objections to settlement; and

- Counsels' plan to apply for attorneys' fees of no more than 25% of the settlement fund and reimbursement of expenses, all to be paid out of the settlement fund.

(Id.)

Claimants who chose to exclude themselves from the settlement were required to send a Notice of Exclusion to the settlement administrator by December 17, 2001. On the exclusion form, claimants had to provide identification information and the amount paid for Coumadin during the class period and had to certify that the information provided was true. (Id.)

To make a claim, consumers were required to submit a Proof of Claim identifying their name, address, date they began using Coumadin (by year), and the amount paid for Coumadin during the class period (with any reimbursements from insurance deducted), along with proof of their most recent purchase of Coumadin during the class period. The claimants also had to certify that the information provided was true and correct. (Id.)

27

The TPPs were required to submit a Proof of Claim
identifying the TPP or agent making the claim and the total
amount paid for Coumadin during the class period.  (Id.)  TPP
claimants also were required to certify that the amount claimed
was true and accurate and based upon actual records maintained by
or otherwise available to the claimants and to agree to furnish
additional documentary backup upon request of the settlement
administrator.  (Id.)

The website developed by CCS provided class members access
to the full notice of settlement, the Stipulation of Settlement
and Compromise, and proof of claim forms.  (Id., Ex. C at ¶ 7)

By January 2, 2002, the settlement administrator had
received over 89,000 telephone inquiries.  (Id., Ex. C at ¶ 6)
In addition, more than 41,803 "visits" were made to the
settlement website and 15,127 forms viewed and/or downloaded.
(Id., Ex. C at ¶ 7)  An additional 7,273 requests for printed
notice packets were received via e-mail.  (Id.)  Through June 3,
2002, the administrator had mailed claim forms to 90,926
potential consumer class members, and received and processed
48,305 consumer claims and 1,055 TPP claims.  (D.I. 281 at ¶ 3;
Ex. B)  A total of 136 consumers and ten TPPs opted out of the
proposed settlement by the December 17, 2001 deadline.  (D.I. 237
at ¶ 146)

28

## F.    Objections

Thirteen objections to the settlement were filed by the
December 17, 2001 deadline, including eleven from individual
consumers or consumer groups[11] and two from TPPs.[12]    The
objections can generally be categorized into the following
subject areas:

- Amount of settlement

- Conflicts of interest between consumers and TPPs

- Allocation of settlement proceeds

- Settlement class certification

- Sufficiency of notice

- Scope of release

- Amount of attorneys' fees and costs

The substance of the objections is summarized and addressed as
appropriate within the individual discussions of class

---

[11]Consumer objections were filed by: Jean Bradley et al.
(D.I. 214); Shirley Bruce (D.I. 210); Mary L. Cleusman et al.
("Tennessee objectors") (D.I. 218); Julious M. Davis (D.I. 191);
Seymour Eagel (D.I. 194); Alexander Galperin (D.I. 216); Kenard
C. Hansen (D.I. 245); Willie Hutchinson, Jr. and Vincent
Palazzola (D.I. 202); Garey L. McCarty (D.I. 198); Ramona Nipper
(D.I. 252); Madison W. O'Kelley, Jr. (D.I. 205); J.G. Rodgers
(D.I. 259, Ex. 13; not filed directly with the court); Alan
Shapiro (D.I. 186).

[12]TPP objections were filed by: Trigon Blue Cross Blue
Shield et al. ("Blue Cross Health Plans") (D.I. 196); Health Care
Service Corporation ("HCSC") (D.I. 207).

29

certification, notice, settlement fairness, and attorneys' fees
and expenses.

In addition to objections to the settlement, several
objectors filed motions to intervene in the litigation itself.[13]

## G.   Fairness Hearing

The fairness hearing was held January 23, 2002.   Oral
argument was presented by plaintiffs' counsel and by counsel
representing objectors HCSC, Bradley, Bruce, Cleusman, Eagel,
Galperin, Hansen, Hutchinson, McCarty, Nipper, O'Kelley,
Palazzola, and Shapiro.   (D.I. 267)   No evidence was presented.

## III. JURISDICTION

The court has subject matter jurisdiction over this action
pursuant to 28 U.S.C. §§ 1331 and 1337, providing for exclusive
federal district court jurisdiction over "federal question"
claims.   Plaintiffs' claims for injunctive relief under Section
16 of the Clayton Act, 15 U.S.C. § 26, to prevent violations of
Section 2 of the Sherman Act, 15 U.S.C. § 2, meet the "federal
question" requirement.

The court asserts supplemental jurisdiction over plaintiffs'
state law claims under 28 U.S.C. § 1367.   All of the claims flow
from a common nucleus of operative fact and are part of the same

---

[13]Objectors HCSC (D.I. 254), Bradley et al. (D.I. 212),
Cleusman et al. (D.I. 218), and McCarty (D.I. 200) filed motions
to intervene.

case or controversy under Article III of the United States Constitution.[14]   See In re The Prudential Ins. Co. of American Sales Practices Litigation, 148 F.3d 283, 300-303 (3d Cir. 1998).

The court also finds that it obtained personal jurisdiction over absentee class members by providing proper notice of the impending class action to class members and by providing absentees with the opportunity to be heard and to exclude themselves from the class. · This process satisfies due process requirements.   In re Prudential, 148 F.3d at 306 (citing Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 811-12 (1985)). Reasonable notice was provided to the consumer class members through the mass media and to TPP class members through individual mailings.   The notice informed class members that they could either opt out of the settlement or submit objections in writing and/or orally at the fairness hearing.

Finally, the court finds that the named parties individually meet the requirements of Article III standing.   Each named party sufficiently alleges injury in fact - overpayment for warfarin sodium - as a result of defendant's alleged product misrepresentations and monopolistic activities and has a valid

---

[14]Plaintiffs also claim diversity jurisdiction.   However, plaintiffs do not allege that either the individual class representatives or the individual members of the class sustained the minimum amount of damages required for the court to assert diversity jurisdiction.   See In re The Prudential, 148 F.3d at 303 (3d Cir. 1998).

31

"case or controversy" with respect to defendant.  (Consol. Compl. ¶¶ 70, 72)  So long as the class representatives have constitutional standing to raise a particular issue before the court, no further constitutional standing requirements exist for the remainder of the class.  See In re Prudential, 148 F.3d at 306-7.

## IV.  CLASS CERTIFICATION FOR PURPOSES OF SETTLEMENT

Plaintiffs seek certification of the following class for settlement purposes:

> All consumers and Third Party Payors in the United States who purchased and/or paid all or part of the purchase price of Coumadin dispensed pursuant to prescriptions in the United States during the period March 1, 1997 through and including August 1, 2001 ("Class Period").  Excluded from the Class are Defendant and any of its officers and directors, and any governmental entity.  "Third Party Payor" shall mean any nongovernmental entity that is (i) a party to a contract, issuer of a policy, or sponsor of a plan, which contract, policy or plan provides prescription drug coverage to natural persons, and is also (ii) at risk, pursuant to such contract, policy, or plan, to provide prescription drug benefits, or to pay or reimburse all or part of the cost of prescription drugs dispensed to natural persons covered by such contract, policy, or plan.

(D.I. 233)

To be certified, a class must satisfy the four threshold requirements of Rule 23(a) of the Federal Rules of Civil Procedure: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.  See Amchem Products, Inc. v.

Windsor, 521 U.S. 591, 613 (1997). In addition, the parties
seeking certification must show the action is maintainable under
Rule 23(b)(1), (2), or (3). Id. at 614. Rule 23(b)(3), the
category at issue in this case, allows. for so-called "opt-out"
class actions for damages. Id. at 614-5. Under Rule 23(b)(3),
two additional requirements must be met for a class to be
certified: (a) common questions must predominate over any
questions affecting only individual members; and (b) class
resolution must be superior to other available methods for the
fair and efficient adjudication of the controversy. Id. at 615.
The court must take a "close look" at the predominance and
superiority criteria, including the following pertinent factors:

> (A) the interest of members of the class in
> individually controlling the prosecution or defense of
> separate actions; (B) the extent and nature of any
> litigation concerning the controversy already commenced
> by or against members of the class; (C) the
> desirability or undesirability of concentrating the
> litigation of the claims in the particular forum; (D)
> the difficulties likely to be encountered in the
> management of a class action.

Id. at 615-6 (quoting Fed. R. Civ. P. 23(b)(3)). The Supreme
Court has noted that the dominant purpose behind certifying Rule
23(b)(3) cases is to vindicate the rights of people who
individually would be without the strength to bring their
opponents into court; it overcomes the problem of small
recoveries, which do not provide enough incentive for individual
actions to be prosecuted. Id. at 617.

Class certification requirements must be met even in the settlement context, except that the court "need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial." Id. at 620.

The court does not inquire into the merits of a lawsuit while determining whether it may be maintained as a class action. See Eisen v. Carlisle and Jacquelin, 417 U.S. 156, 177 (1974).

## A.    Numerosity

To be certified, the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). This class potentially includes 2 million or more members, thus it easily satisfies the numerosity requirement.

## B.    Commonality and Predominance

Commonality requires that class members share a single common issue. See Baby Neal ex rel. Kanter v. Casey, 43 F.3d 48, 56 (3d Cir. 1994). Predominance requires that common issues **predominate** over issues affecting only individuals. Fed. R. Civ. P. 23(b)(3). The Third Circuit requires that the commonality and predominance requirements be analyzed together, because the predominance requirement, which is "far more demanding," incorporates the commonality requirement. In re LifeUSA Holding, Inc., 242 F.3d 136, 144 (3d Cir. 2001).

34

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem, 521 U.S. at 623. The Supreme Court has opined that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." Id. at 625.

The court finds that in the case at bar common questions of fact and law predominate over any questions affecting only individual members. Common questions of fact and law alleged by plaintiffs include:

• Whether defendant monopolized and attempted to monopolize the United States market for warfarin sodium;

• Whether defendant caused plaintiffs and the class to overpay for Coumadin by disseminating false and/or deceptive information to TPPs, patients, doctors, and pharmacists concerning the use, quality, and effectiveness of bioequivalent generic warfarin sodium;

• Whether and to what extent the conduct of defendant caused injury to plaintiffs and the class and, if so, the appropriate measure of damages;

35

•    Whether defendant's misrepresentations concerning

generic warfarin sodium have violated, and continue to violate,

the Delaware Consumer Fraud Act;[15]

•    Whether plaintiffs and members of the class are

entitled to declaratory and/or injunctive relief;

•    Whether defendant was unjustly enriched as a result

of its actions.

This case is clearly focused on the allegedly deceptive

conduct of defendant and the effect that conduct had on market

penetration by the generic substitute and the prices paid for

warfarin sodium; it is not focused on the conduct of individual

class members.   See In re Flat Glass Antitrust Litigation, 191

F.R.D. 472, 483-4 (W.D. Pa. 1999) (noting predominance test is

met in antitrust case because "consideration of the conspiracy

issue would, of necessity, focus on defendants' conduct, not the

---

[15]The Delaware Consumer Fraud statute, 6 Del. C. §§ 2511 et
seq., protects non-residents as well as residents from unfair or
deceptive merchandising practices conducted "in part or wholly
within" the State.   See Lony v. E.I. du Pont de Nemours and
Company, Inc., 821 F. Supp. 956, 961 (D. Del. 1993) (finding
standing for citizen of Germany where the alleged
misrepresentation commenced in Delaware).   Hence, class members
from other states can assert Delaware law in this case, so long
as the members' own state consumer fraud statutes do not have
material conflicts with the Delaware statute and Delaware has
significant contacts with the asserted claims of these
plaintiffs.   See Phillips Petroleum Co. v. Shutts, 472 U.S. 797,
814-823 (1985).   Plaintiffs have alleged here that defendant's
deceptive conduct "arose, was directed and emanated from
Delaware," which is enough to invoke the Delaware statute on
behalf of the class.   (D.I. 163-at ¶ 96)

individual conduct of the putative class members."). Plaintiffs'

claims arise from an alleged broad-based communications campaign

to deceive consumers, TPPs, physicians, and regulatory bodies

into believing a generic version of warfarin sodium could not be

directly substituted for Coumadin, thereby discouraging consumers

from switching to lower priced generic warfarin sodium and

allowing defendant to charge supracompetitive prices for

Coumadin.  The claims do not rely on the conduct or reliance of

individual consumers or TPPs.  Rather, they depend on proof that

defendant made misrepresentations about Coumadin and generic

warfarin sodium that allowed it to maintain its monopoly in the

warfarin sodium market, discourage switching to lower-cost

generic warfarin sodium, and charge supracompetitive prices for

Coumadin.  Proof of liability thus depends on evidence common to

the class.[16]

---

[16]To prove a violation of Section 2 of the Sherman Act,
plaintiffs must demonstrate that defendant possesses monopoly
power in the warfarin sodium market and that it willfully
acquired or maintained that power as distinguished from achieving
growth or development as a consequence of a superior product,
business acumen, or historic accident.  See United States v.
Grinnell Corp., 384 U.S. 563, 570-1 (1966).  To prove a violation
of the Delaware Consumer Fraud statute, plaintiffs need only show
that defendant committed fraud or misrepresentation in connection
with its sale of Coumadin; no proof of individual reliance on the
fraud or misrepresentation is required.  See Delaware Consumer
Fraud Statute, 6 Del. C. § 2513; S&R Assocs. v. Shell Oil Co.,
725 A.2d 431, 440 (Del. Super. Ct. 1998).

Several other courts have recently certified nationwide or multi-state classes under federal and state laws in actions alleging overpayment for prescription drugs.[17] The case at bar also bears similarities to In re Prudential, 148 F.3d 283 (3d Cir. 1998), in which the Third Circuit affirmed a class certification and settlement in a nationwide class action brought pursuant to federal and state securities fraud statutes.[18]

The fact that plaintiffs alleged purely economic harm from a common cause (overpayment for warfarin sodium that resulted from defendant's deceptive communications) further supports certification of the class. These allegations present none of

---

[17]The Northern District of Illinois certified separate nationwide consumer and TPP classes in a class action brought under federal antitrust law and the consumer fraud statutes of two states. In re Synthroid Marketing Litigation, 188 F.R.D. 295 (N.D. Ill. 1999) (consumer class certification); In re Synthroid Marketing Litigation, 188 F.R.D. 287 (N.D. Ill. 1999) (TPP class certification). The court in the District of Columbia recently approved various settlements of prescription drug antitrust litigation that included two multi-state consumer classes and two multi-state TPP classes. In re Lorazepam & Clorazepate Antitrust Litigation, Nos. MDL 1290(TFH) and 99MS276(TFH), 2002 WL 246664 (D.D.C. Feb. 1, 2002). A Michigan court certified a class of indirect prescription drug purchasers that included both consumers and TPPs in an action brought pursuant to state antitrust statutes. In re Cardizem CD Antitrust Litigation, 200 F.R.D. 326 (E.D. Mich. 2001).

[18]The defendant in In re Prudential allegedly engaged in a common, nationwide scheme to defraud customers through standardized, deceptive sales presentations. Id. at 314. The Third Circuit affirmed the district court's determination that common issues predominated over individual issues, and rejected an objector's contention that predominance was defeated because the claims were subject to the laws of fifty states. Id. at 315.

38

the individual proof problems and divergent interests that have
arisen in some other class actions.[19]   See In re Prudential, 148
F.3d at 315 (noting "the complexity of a case alleging physical
injury as a result of asbestos exposure [Amchem] differs greatly
from a case alleging economic injury as a result of deceptive
sales practices").

The case at bar can also be distinguished from cases where
liability depends on specific deceptive communications made to
individual class members and members' reliance on those
communications.   See In re LifeUSA Holding, Inc., 242 F.3d at
144-6 (reversing a class certification in part because
plaintiffs' claims of deceptive insurance sales practices arose
from individual and nonstandardized presentations by numerous
independent agents, rather than uniform, scripted presentations).
Here, the alleged deception involved a broad-based, national
campaign conducted by and directed from corporate headquarters,
and individual reliance on the misrepresentations is irrelevant
to liability.   Where state consumer fraud statutes do not require
proof of reliance, as is the case here, plaintiff "need only

---

[19]See, e.g., Georgine v. Amchem Products, Inc., 83 F.3d 610,
630 (3d Cir. 1996), aff'd, Amchem Products, Inc. v. Windsor, 521
U.S. 59 (1997) (reversing a certification in a personal injury
class action because of "the multiplicity of individualized
factual and legal issues, magnified by choice of law
considerations," and because some class members would develop
their injuries sometime in the future and other members were
presently injured)

establish a causal link between the [deceptive] conduct at issue

and his or her injury," and this individual issue of causation

does not necessarily defeat predominance of the common issues

about defendant's course of conduct. Mulligan v. Choice Mortgage

Corp. USA, No. 96-596-B, 1998 WL 544431, at *11-*12 (D.N.H. Aug.

11, 1998) (finding common issue of whether defendant's practices

were unfair or deceptive in violation of state consumer fraud

statute predominated despite need for individual proof of

causation, where no proof of individual reliance was required by

the statute); see also Hill v. Gateway 2000, Inc., No. 96 C 4086,

1996 WL 650631, *6 (N.D. Ill. Nov. 7, 1996) (certifying class

under Illinois and South Dakota consumer fraud statutes because

no showing of reliance required, but denying certification of UCC

claims because reliance was a necessary requirement).

The court also concludes that the need for individual

damages calculations does not defeat predominance and class

certification. See Baby Neal, 43 F.3d at 57 (finding that

individual damage determinations did not undermine commonality

finding); Bogosian v. Gulf Oil Corp., 561 F.2d 434, 456 (3d Cir.

1977) (recognizing that the necessity for calculation of damages

on an individual basis does not preclude class certification

where common issues determining liability predominate); In re

Prudential Ins. Co. of America, 962 F. Supp. 450, 517 (D.N.J.

40

1997) ("Individual damages issues do not defeat an otherwise valid class certification.").

One objector argues that claims under various state consumer fraud and antitrust laws defeat predominance because of variations in the state laws. (D.I. 194, Eagel Objection) However, the Third Circuit has recognized that these issues can be minimized by grouping state statutes and common law that share common elements of liability or common defenses, particularly where the lawsuits do not involve personal injuries.  See In re Prudential, 148 F.3d at 315; In re School Asbestos Litigation, 789 F.2d 996, 1010 (3d cir. 1986).  This court also notes that, so far as differences between state laws impact only on case management, these differences are irrelevant to certification of a settlement class.  See Amchem, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial.").

Based on the above, the court finds that common questions of fact and law predominate over any questions affecting only individual members.

41

C.    **Typicality**

The claims or defenses of the named class representatives
must be "typical of the claims or defenses of the class."   Fed.
R. Civ. P. 23(a)(3).   "The typicality requirement is designed to
align the interests of the class and the class representatives so
that the latter will work to benefit the entire class through the
pursuit of their own goals."   In re Prudential, 148 F.3d at 311.
"Typicality lies where there is a strong similarity of legal
theories [] or where the claims of the class representatives and
the class members arise from the same alleged course of conduct
by the defendant. . . ."   In re the Prudential, 962 F. Supp. at
518 (internal citation omitted).

Here, the claims of the representative plaintiffs arise from
the same course of conduct that gave rise to the claims of the
other class members and are based on the same general legal
theories.   Plaintiffs allege that defendant misled consumers,
TPPs and others regarding the bioequivalence of generic warfarin
sodium to Coumadin, which resulted in economic harm to plaintiffs
through overpayment for warfarin sodium.   The most obvious
differences between class members is that some are consumers of
Coumadin and some are TPPs.   However, the named class
representatives include both consumers and TPPs, so each type of
class member is represented by one or more named plaintiffs.   Two
of the named consumer plaintiffs reside in "indirect purchaser"

42

states (New Jersey and Florida), so potentially divergent
interests on damages are also represented by named plaintiffs,
though courts have found that differences in the amount of
damages suffered between class representatives and class members
does not render the named plaintiffs' claims atypical.  <u>See</u> <u>In re</u>
<u>NASDAQ Market-Makers Antitrust Litigation</u>, 169 F.R.D. 493, 510
(S.D.N.Y. 1996).

Based on the above, the court finds the claims of the named
plaintiffs are typical of the claims of the class.

## D.    Adequate Representation

Rule 23(a) also requires that "the representative parties
will fairly and adequately represent the interests of the class."
Fed. R. Civ. P. 23(a)(4).  "First, the adequacy of representation
inquiry 'tests the qualifications of the counsel to represent the
class.'   Second, it 'serves to uncover conflicts of interest
between named parties and the class they seek to represent.'"  <u>In</u>
<u>re Prudential</u>, 148 F.3d at 313 (internal citations omitted).

The class counsel at bar are well qualified and experienced
class action attorneys who have been involved in similar drug
litigation around the country.  Counsel vigorously pursued this
litigation in this court and in several state courts over a
period of more than three years, conducting extensive document
discovery and numerous depositions before engaging in settlement

43

negotiations.   Any potential conflicts between consumers and TPPs were adequately represented by separate counsel for consumers and TPPs.   The existence of separate consumer and TPP counsel provides adequate "structural protections to assure that differently situated plaintiffs negotiate for their own unique interests."   Georgine, 83 F.3d at 631 (finding inadequate representation of disparate groups of plaintiffs where no such structural protections existed).

As noted in the typicality discussion, named parties include both consumers and TPPs, and named consumers include two from "indirect purchaser" states.   The named plaintiffs share a strong interest in establishing liability of defendant, seeking the same type of damages (compensation for overpayment) for the same type of injury (overpayment for warfarin sodium).   The court finds that any alleged conflict goes to how the settlement fund should be allocated.   (D.I. 214, Bradley Objection)   While some courts in similar cases have certified consumers and TPPs as separate classes or subclasses, there does not appear to be any compelling reason to require separate classes or subclasses here in the context of settlement.   Instead, the court will address allocation of the settlement fund between consumers and TPPs in its discussion of settlement fairness.

44

Based on the above discussion, the court finds the named plaintiffs will fairly and adequately represent the interests of the class.

## E.   Superiority

"The superiority requirement asks the court 'to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication.'" In re Prudential, 148 F.3d at 316.   The factors set out in Rule 23(b)(3) help the court assess whether a class action is superior to other available methods of adjudication.   In the case of consumers, the class members here have little interest in "individually controlling the prosecution or defense of separate actions," Fed. R. Civ. P. 23(b)(3)(A), because each consumer has a very small claim in relation to the cost of prosecuting a lawsuit.   A class action facilitates spreading of litigation costs among numerous litigants and encourages private attorney general enforcement of statutes.   See In re General Motors, 55 F.3d at 784.   This is less true for the TPP members of the class, some of whom have significant individual claims.   However, the TPPs had the option to opt-out of the settlement if they believed it was worth it to them to pursue litigation separately. Plaintiffs assert there are potentially thousands of TPPs who have claims, so this large number of potential TPP plaintiffs − added to the 2 million consumers − strongly suggests the use of

45

the class action device as the most efficient way to resolve the
asserted claims.

In addition, a relatively small number of individual
lawsuits were pending against defendant in this matter,
indicating a lack of interest in individual prosecution of
claims.  See In re Prudential, 148 F.3d at 316; see also Fed. R.
Civ. P. 23(b)(3)(C).  Furthermore, the presence of defendant's
place of business in Delaware and the initial filing of several
separate class action lawsuits in Delaware make it a desirable
forum in which to concentrate the litigation, a conclusion
already reached by the Multi-District Litigation Panel that
consolidated several pending federal lawsuits here.  See In re
Prudential, 148 F.3d at 316; see also Fed. R. Civ. P.
23(b)(3)(D).

In sum, the court finds that the class action device is
clearly superior in terms of fairness and efficiency to other
available methods of litigation.

**F.   Objections to Settlement Class Certification**

Several class members object to certifying a single,
nationwide class because some members may be eligible for treble
damages or punitive damages under their state antitrust or
consumer fraud statutes, and Tennessee and Kansas members may be
eligible for "full consideration" damages, thereby destroying

46

commonality. (D.I. 218, Tennessee Objectors) These differences, however, go to damages calculations and thus do not destroy commonality or predominance, though they may be considered by the court in assessing the fairness of the settlement.

The court is also unpersuaded by one class member's objection to applying Delaware state law to class members from other states. (D.I. 194, Eagel Objection) Where the defendant's headquarters are located in Delaware and the alleged deceptive acts originated in Delaware, it is proper to apply the Delaware consumer fraud statute to a nationwide class. See In re Cordis Corp. Pacemaker Product Liability Litigation, No. C-3-86-543, 1992 U.S. Dist. LEXIS 22612, at *49 (S.D. Ohio Dec. 23, 1992) (noting that it is proper under Supreme Court precedent to apply a particular state's laws in a nationwide class action if the defendant's headquarters are in that state and many of the acts upon which liability is predicated took place there).

Finally, objectors assert that consumers who pay a fixed co-pay[20] for their prescription drugs cannot be included in the certified class because they have suffered no damages. (D.I.

---

[20]A "fixed co-pay" as it is used here means the insured pays the same co-pay amount for prescription drugs regardless of whether they are name-brand or generic. Plaintiffs assert that most insureds who have co-pays pay a higher co-pay for name-brand prescription drugs than for generic drugs. Another type of co-pay is a "percentage co-pay," in which the insured pays a percentage of the drug's cost.

245, Hansen; D.I. 205, O'Kelley; D.I. 210, Bruce; D.I. 198,
McCarty; D.I. 216, Galperin)  The court concludes, however, that
fixed co-pay consumers need not be excluded from the settlement
class, because they still have claims for injunctive and other
equitable relief.  In addition, a class can be certified even
where some individual, absentee class members may later prove not
to be injured, in particular where causation can be shown by
generalized damage to all and individual damage determinations
can be left to the damages phase of litigation.  See In re NASDAQ
Market-Makers Antitrust Litigation, 169 F.R.D. 493, 523 (S.D.N.Y.
1996) ("Even if it could be shown that some individual class
members were not injured, class certification, nevertheless, is
appropriate where the antitrust violation has caused widespread
injury to the class.").  The fairness of including fixed co-pay
consumers in the settlement fund distribution is addressed in the
discussion of settlement fairness.

In conclusion, the court finds the objections raised to
class certification unpersuasive, finds the proposed class meets
the requirements of Rule 23, and certifies the class for
settlement purposes.

## V.    NOTICE

Before certifying a class or approving a class settlement,
the court must direct that notice of the proposed settlement be
disseminated to class members.  Fed. R. Civ. P. 23(c)(2) & 23(e).

"To alert class members to their right to 'opt out' of a (b)(3) class, [Rule 23(c)(2)] instructs the court to 'direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.'"  Amchem, 521 U.S. at 617 (quoting Fed. R. Civ. P. 23(c)(2)).

The settlement notice requirement is found in Rule 23(e), which specifies that "[n]o class action may be 'dismissed or compromised without [court] approval,' preceded by notice to class members."  Id. (quoting Fed. R. Civ. P. 23(e)).

As described in detail earlier, plaintiffs executed a court-approved plan to provide notice to class members that began immediately after preliminary approval of the settlement.  The notice was designed to meet the requirements of both Rule 23(c) and Rule 23(e) and follow the procedures recommended by the Manual for Complex Litigation ("MCL"), 3d ed., § 30.21.  The parties provided individual notice to class members who could be identified through reasonable effort by assembling a mailing list of over 12,000 potential TPP class members and sending individual notice packets to all TPPs on the list by first class mail.  This was supplemented by publication of a summary notice in industry-specific journals as well as general interest newspapers and magazines.  Although individual notice was not reasonable or even possible to consumers, given the large number of potential

49

consumer class members, the best notice practicable under the circumstances was given by publishing the summary notice in newspapers and magazines which were likely to be read by potential class members and which had ·a· combined circulation of 115 million people.  The summary notice provided potential class members with an address and toll-free telephone number from which they could obtain the full notice and claims packet, as well as the website address at which they could view or download the information themselves.

The summary and full notice properly informed potential class members of their right to be excluded from the class, indicated that the judgment would bind all class members who did not request exclusion, and informed members who did not request exclusion that they could enter an appearance through counsel. See Fed. R. Civ. P. 23(c)(2).  In addition, the notice informed class members (1) of the nature of the pending litigation; (2) of the settlement's general terms; (3) that complete information was available from the court files; and (4) that any class members could appear and be heard at the fairness hearing.  See In re Prudential Ins. Co. of America, 962 F. Supp. 450, 527 (D.N.J. 1997) (citing 2 H. Newberg, Newberg on Class Actions § 8.32 at 8-103).  In sum, the notice contained all the information recommended by other courts and by the Manual for Complex

Litigation.   See In re Prudential, 962 F. Supp. at 496; MCL 3d §
30.212.

Notice was also timely in that class counsel initiated
publication of the summary notice within several weeks of
receiving the court's approval and well in advance of the opt-out
deadline and the fairness hearing, giving potential class members
a fair opportunity to obtain the full notice, submit a Notice of
Exclusion, or file objections to the settlement.   To avoid
duplication of mailing and distribution expenses, the notice
packets also included Proof of Claim forms and specified the date
by which claims had to be received.   See MCL 3d § 30.212.

While the notice itself did not include the full text of the
proposed settlement due to its length, the notice summarized the
key terms of the settlement and informed class members that they
could review the Stipulation of Settlement by contacting the
clerk of court.   See id. ("[T]he notice must contain a clear,
accurate description of the key terms [of the settlement] and
tell class members where they can examine or secure a copy.")
The Stipulation was also available for viewing at the Coumadin
settlement website.

The court is unpersuaded by several objectors' challenges to
the adequacy of the notice. (See D.I. 205, O'Kelley Obj.; D.I.
210, Bruce Obj.; D.I. 202, Hutchinson, Jr. Obj.; D.I. 198,
McCarty Obj.)   Class members were informed of the nature of the

litigation and the claims and defense offered by the parties as
well as the terms of the settlement and distribution plan.  They
were then given the opportunity to opt out of the settlement and
pursue their own litigation.  The notice did not need to include
details such as how much each class member might receive from the
settlement (a speculative amount at that stage), the confidential
"opt-out" threshold beyond which defendant reserved the right to
withdraw from the settlement (irrelevant to members' opt-out
decision), the estimated number of class members and total
damages they might claim (available from complaint), or
boilerplate release language (available in Stipulation of
Settlement).  The purpose of the notice was to advise class
members of the general terms of the settlement and their rights,
not to speculate on potential distributions, provide details of
the litigation, or discuss all the factors considered in
approving the settlement.  Furthermore, "[c]lass members are not
expected to rely upon the notices as a complete source of
settlement information."  Grunin v. International House of
Pancakes, 513 F.2d 114, 122 (8th Cir. 1975).

Based on the above, the court finds the notice satisfied the
requirements of both Rule 23(c)(2) and Rule 23(e) and complied
with the standards suggested by the MCL and other courts.  It
provided potential class members with "the information necessary
to make an informed and intelligent decision whether to

participate in the class and whether to object to the Proposed

Settlement." In re Prudential, 962 F. Supp. at 526.

## VI. FAIRNESS OF SETTLEMENT

### A. Role of Court and Presumption of Fairness

Federal Rule of Civil Procedure 23(e) provides that "[a]

class action shall not be dismissed or compromised without the

approval of the court. . . ," thereby protecting "unnamed class

members from unjust or unfair settlements affecting their rights

when the representatives become fainthearted before the action is

adjudicated or are able to secure satisfaction of their

individual claims by a compromise." Amchem, 521 U.S. at 623.

The Third Circuit has expressed a need for heightened scrutiny

where a case is settled before the class has been formally

certified. In re General Motors Corp. Pick-Up Truck Fuel Tank

Prods. Liab. Litig., 55 F.3d 768, 805 (3d Cir. 1995). The

court's duty is to protect absent class members by assuring the

settlement represents adequate compensation for the release of

the class claims, a duty which some courts have described as a

"fiduciary responsibility." Id.

Nevertheless, the Third Circuit also has held that there is

an overriding public interest in settling and quieting

litigation, particularly in class actions. See Id. at 784 ("the

law favors settlement, particularly in class actions and other

53

complex cases where substantial judicial resources can be
conserved by avoiding formal litigation"); In re School Asbestos
Litig., 921 F.2d at 1333 (Third Circuit's policy is to encourage
settlement of complex litigation "that otherwise could linger for
years").

An initial "presumption of fairness for the settlement is
established if the court finds that: (1) the negotiations
occurred at arm's length; (2) there was sufficient discovery; (3)
the proponents of the settlement are experienced in similar
litigation; and (4) only a small fraction of the class objected."
In re Cendant Corp. Litigation, 264 F.3d 201, 232 n.18 (3d Cir.
2001) (citing In re General Motors, 55 F.3d at 785).

In the case at bar, class counsel submitted affidavits
showing the settlement resulted from intensive, arm's length
negotiations between counsel for plaintiffs and defendant, in
which both consumer counsel and TPP counsel fully participated.
The proposed settlement came after more than three years of
litigation and discovery, including review of hundreds of
thousands of documents produced by defendant, numerous
depositions, and consultation with experts.  Counsel also declare
their experience in this type of complex class action litigation,
including involvement in a similar prescription drug overcharge
class action for which the district court recently approved
settlement.  See In re Lorazepam, supra.  Finally, only a small

fraction of the class objected to the settlement, as discussed more fully below.  Accordingly, the court approaches the fairness determination with a presumption that the settlement is fair.

**B.   Girsh Factors**

To determine whether the settlement is fair, reasonable, and adequate under Rule 23(e), the Third Circuit applies the nine-factor test set forth in Girsh v. Jepson, 521 F.2d 153 (3d Cir. 1975).  See also In re Cendant, 264 F.3d at 231.

### 1.   Complexity, Expense and Likely Duration of Litigation

"This factor captures 'the probable costs, in both time and money, of continued litigation.'"  In re Cendant, 264 F.3d at 233. Settlement is particularly favored in a complex class action such as this.  Although significant discovery has already taken place, to continue this litigation through trial would require additional discovery, extensive pretrial motions addressing complex factual and legal questions, and a complicated, lengthy trial.  The costs would significantly increase the substantial costs already incurred.  In addition, any judgment would likely be the subject of posttrial motions and appeals, further prolonging the litigation and reducing the value of any recovery to the class.

In sum, this factor strongly supports settlement.

55

## 2.    Class Reaction

"This factor attempts to gauge whether members of the class support the settlement," although the court needs to be careful not to infer too much from a small number of objectors to a sophisticated settlement.   In re Prudential, 148 F.3d at 318. After an extensive nationwide notice program, very few class members filed objections to the proposed settlement: eleven from consumers or consumer groups and two from TPPs.   In addition, only 136 consumers and ten TPPs opted-out of the settlement class.   The court finds the low number of objections from TPPs particularly significant, because these are sophisticated businesses with, in some cases, large potential claims, and they could be expected to object to a settlement they perceived as unfair or inadequate.   Consequently, the court finds this factor weighs in favor of settlement.

## 3.    Stage of Proceedings and Amount of Discovery
## Completed

This factor evaluates whether counsel had an adequate appreciation of the merits of the case before negotiating.   In re Cendant, 264 F.3d at 235.   "To ensure that a proposed settlement is the product of informed negotiations, there should be an inquiry into the type and amount of discovery the parties have undertaken."   In re Prudential, 148 F.3d at 319.

56

As described in detail earlier, class counsel pursued this litigation for over three years on several fronts before negotiating this settlement. Consumer plaintiffs filed four separate actions in federal court which were eventually coordinated in this court by the Multi-District Litigation Panel. Consumer counsel also engaged in substantial discovery and coordinated these efforts with other plaintiffs' counsel in related state and federal actions. Several TPPs filed separate lawsuits in federal court and worked together with the consumer plaintiffs to consolidate their actions and reach settlement with defendant. In parallel with the federal actions, plaintiffs' counsel pursued actions in several state courts, including Illinois, California, Tennessee, New York, Alabama, and Wisconsin, on behalf of consumers and TPPs.

In the course of these various federal and state actions, voluminous documents were reviewed and numerous depositions taken and motions filed. In addition, an expert was engaged in at least one of the state actions, and experts were consulted by both consumers and TPPs in conjunction with settlement negotiations. The settlement resulted from over a year of intense, arm's length negotiations between consumer counsel, TPP counsel, and defendant's counsel.

Based on the above, the court finds that counsel had an adequate appreciation of the merits of the case before

57

negotiating and, thus, the proposed settlement is the product of informed negotiations. As a result, this factor strongly favors approval of the settlement at this stage of the litigation.

## 4.   Risks of Establishing Liability

This factor considers the potential rewards or risks if class counsel decided to litigate rather than settle. In re Cendant, 264 F.3d at 237. The history of litigation in federal and state courts shows the risks of establishing liability in this case, both through procedural barriers to instituting and maintaining a nationwide class action and through barriers to proving liability.

Plaintiffs advanced several theories of liability under federal and state antitrust laws, state consumer protection laws, and state common law. Defendant successfully barred consumer plaintiffs' standing, as indirect purchasers, to recover damages under the federal antitrust laws. Getting nationwide class certification under state law also presented difficulties, with one state denying class certification under the "indirect purchaser" state antitrust laws. Nevertheless, one state court has certified a nationwide consumer class under state consumer protection law and was set to consider intervention by TPPs.

If the case at bar were to proceed to trial, defendant could be expected to challenge class certification, and a class

58

certified now could be decertified at any time later in the litigation. The defendant could also challenge the standing of TPPs and raise several other substantial defenses, including the Noerr-Pennington doctrine and First Amendment defenses to protect its activities lobbying state pharmaceutical boards and providing information to pharmacists, doctors, and the public.

Based on the detailed allegations in the complaint, plaintiffs have strong evidence that defendant conducted a deceptive communications campaign to convince consumers, physicians, TPPs, and others that generic warfarin sodium could not be directly substituted for Coumadin. The FDA is on record warning defendant about its communications and calling them false and misleading. Nevertheless, to prove their antitrust and consumer fraud claims, plaintiffs would also have to show these activities caused harm to consumers and TPPs. In this regard, the learned intermediary doctrine presents a barrier to proving that any deceptive representations made by defendant were the proximate cause of plaintiffs' injuries. See, e.g., Rivera v. Wyeth-Ayerst Laboratories, 283 F.3d 315, 321 (5th Cir. 2002). Under the theory, a learned intermediary such as the prescribing doctor, pharmacist, or state pharmaceutical board could be deemed to have made the critical choice about whether Coumadin or the generic was available to the consumer.

59

The court concludes that, on balance, this factor favors settlement, despite low risk in establishing that defendant's activities were deceptive, because of the difficulty of obtaining class certification, the strong defenses that defendant could raise to liability, and the difficulties in proving causation.

## 5.   Risks of Establishing Damages

"Like the fourth factor, 'this inquiry attempts to measure the expected value of litigating the action rather than settling it at the current time.'"   In re Cendant, 264 F.3d at 238 (citation omitted).   In particular the court looks at the potential damage award if the case were taken to trial against the benefits of immediate settlement.   In re Prudential, 148 F.3d at 319.

Damages would likely be established at trial through "a 'battle of experts,' with each side presenting its figures to the jury and with no guarantee whom the jury would believe."   In re Cendant, 264 F.3d at 239.   In an affidavit, plaintiffs' damages expert, Dr. Gary L. French,[21] discusses the various challenges defendant has made to his damages model and how that would affect

---

[21]Dr. French states that he is a Senior Vice President of Nathan Associates Inc., an economic and management consulting firm that provides economic research and analysis to public and private clients in the United States and abroad.   He holds masters and doctoral degrees in economics and has experience analyzing economic and financial issues in antitrust and other complex litigation.   (D.I. 238 at ¶¶ 1-3)

defendant's liability.  (D.I. 238)  For example, defendant
contends that the price differential between Coumadin and generic
warfarin sodium is much less than 25%; that those consumers who
maintain loyalty to Coumadin would not have been injured, because
defendant increased the price of Coumadin even with generic
competition (relying on brand loyal customers continuing to buy
Coumadin, even at higher prices); that Narrow Therapeutic Index
drugs[22] such as Coumadin resist generic penetration, thus
increasing the number of consumers who would not have switched to
the generic; and that its allegedly deceptive conduct ended less
than one year after the start of the damage period, thus reducing
damages.  (Id. at ¶ 11)

The court finds that this factor strongly favors settlement
at this time.

### 6. Risks of Maintaining Class Action Status Through Trial

Rule 23(a) allows a district court to decertify or modify a
class at any time during the litigation if it proves to be
unmanageable.  In re Prudential, 148 F.3d at 321.  The risk of
decertification appears to be significant in the case at bar
because of the potential difficulty of managing a nationwide

---

[22]According to the French affidavit, a Narrow Therapeutic
Index drug is one in which the tolerance to the drug is so narrow
that too small a dose can be useless and too large a dose can be
dangerous to the patient's health.  (D.I. 238 at 5 n.4)

61

**8. & 9.  Range of Reasonableness of Settlement in Light
of Best Possible Recovery and All Attendant Risks of
Litigation**

The eighth and ninth <u>Girsh</u> factors ask "whether the
settlement is reasonable in light of the best possible recovery
and the risks the parties would face if the case went to trial."
<u>In re Prudential</u>, 148 F.3d at 322.  The Third Circuit has
counseled that "in cases primarily seeking monetary relief, the
present value of the damages plaintiffs would likely recover if
successful, appropriately discounted for the risk of not
prevailing, should be compared with the amount of the proposed
settlement."  <u>In re General Motors</u>, 55 F.3d at 806 (citing <u>Manual
for Complex Litigation 2d</u> § 30.44).  These damages estimates
should generate a range of reasonableness within which a district
court approving or rejecting a settlement will not be set aside.
<u>Id.</u>  The court must keep in mind that "settlement is a
compromise, a yielding of the highest hopes in exchange for
certainty and resolution."  <u>Id.</u>

Plaintiffs' expert, Dr. French, estimated the maximum
recoverable damages in this case to be approximately $133.8
million.[23]  (D.I. 238 at ¶ 10)  This estimate assumed several

---

[23]This includes $105.63 million in damages to Coumadin
customers who would have switched to the generic, and $28.14
million to those who would have continued using Coumadin, based
on 2.5% supracompetitive pricing for Coumadin  (D.I. 238 at ¶ 10)

things: there are 1.8 million Coumadin users in the United States; defendant's market share would have fallen from 100% in July 1997 to 50% in September 1999 and thereafter, absent its illegal conduct; generic warfarin sodium cost 25% less than Coumadin;[24] and generic competition would have made defendant charge 2.5% less for Coumadin. (Id. at ¶ 9)  Because defendant would have vigorously challenged the basis for plaintiffs' damages figure at trial, Dr. French also estimated that recoverable damages could be as low as $7.1 million. (Id. at ¶ 20)

Dr. French based his estimates on pricing and industry data extracted from documents produced during discovery and on information from industry sources. (D.I. 237 at ¶ 148; D.I. 280 at 7-15)  After reviewing the expert report and supporting materials, the court concludes that Dr. French's estimate of the range of possible damages if the case were to go to trial is reasonable.

One objector argues that the damages estimate is too low because it limits the potential generic penetration rate (absent

---

[24]Dr. French also assumed that Coumadin cost each user an average of $23.15 per month (total sales price, including amounts paid by consumers and by TPPs).  He calculated this figure by dividing $500 million annual Coumadin sales equally among 1.8 million Coumadin users.  (D.I. 280 at 11-12)

64

defendant's unlawful conduct) to 50%, rather than the 90% market penetration typical for generic drugs. (D.I. 207, HCSC Obj.) However, Dr. French explained that he chose the 50% penetration level because warfarin sodium is a Narrow Therapeutic Index ("NTI") drug, and NTI drugs tend to have much lower generic penetration rates than non-NTI drugs. (D.I. 238 at ¶ 14; D.I. 280 at 9-10)

Some class members also contend that the damages estimate should have taken into account the potential for treble damages under antitrust or consumer fraud statutes. Recovery of such damages is purely speculative, however, and need not be taken into account when calculating the reasonable range of recovery. See Lorazepam & Clorazepate Antitrust Litig., 2002 WL 246664, at *4 n.12 ("[T]he standard for evaluating settlement involves a comparison of the settlement amount with the estimated single damages," not treble damages.) (citing In re Ampicillin Antitrust Litig., 82 F.R.D. 652, 654 (D.D.C. 1979) and City of Detroit v. Grinnell Corp., 495 F.2d 448, 458 (2d Cir. 1974)).

To the extent that objectors argue the settlement is not high enough because it does not allow 100% recovery of claimants' losses, the court finds these objections without merit. (D.I. 207, HCSC Obj.; D.I. 214, Bradley Obj.; D.I. 218, Tennessee Obj.) A settlement is by nature a compromise between the maximum possible recovery and the inherent risks of litigation. "The

test is whether the settlement is adequate and reasonable and not whether a better settlement is conceivable." In re Vitamins Antitrust Litig., 2001-1 Trade Cas. (CCH) ¶72,862, 2000 WL 1737867, at *2 (D.D.C. Mar. 31, 2000) ·(internal citation omitted). The court also notes that all class members had the opportunity to opt out of the settlement and preserve their right to independently seek full recovery of their alleged damages, if they believed they could achieve better results.

The settlement amount of $44.5 million represents more than 33% of the maximum possible recovery, a very reasonable settlement when compared with recovery percentages in other class actions. See In re Cendant, 264 F.3d at 241 (approving settlement for 36% recovery and noting that typical recoveries in securities class actions range from 1.6% to 14%). Even a small percentage of the maximum possible recovery can be a reasonable settlement. "Dollar amounts are judged not in comparison with possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case." In re Union Carbide Sec. Lit., 718 F. Supp. 1099, 1103 (S.D.N.Y. 1989). When all the risks of litigation and defendant's alternate damages calculations are also taken into consideration, the $44.5 million settlement amount appears to be quite reasonable.

Accordingly, the court finds the final two <u>Girsh</u> factors, together with the other <u>Girsh</u> factors, strongly support approval of the settlement.

## C.    Allocation and Distribution Plan

Several class members object to the fairness of the settlement allocation plan and the inclusion of TPPs and fixed co-pay consumers in the distribution.

The court observes that some of these objections arise from a misunderstanding of the settlement, with some objectors believing consumers could only recover from 18% of the settlement fund.   (D.I. 186, Shapiro Obj.; D.I. 210, Bruce Obj.; D.I. 216, Galperin Obj.)   In fact, the settlement actually prefers consumers over TPPs in that consumers get preferential access to 18% of the net settlement fund, and then share in the remaining 82% on a <u>pro rata</u> basis with the TPP claimants.   Because of this preference fund, consumer claimants will receive a higher percentage of their recognized losses than will the TPPs.[25]   This preference is fair for several reasons.   First, consumer counsel initiated this litigation and expended much of the time and expense related to the case.   Second, consumer claimants are drawn mostly from an elderly population that warrants special

---

[25]Supplemental submissions by plaintiffs show consumer claimants are likely to receive 100% of their claims, based on the number of claims received by the April 30, 2002 deadline. (D.I. 280 at 5; D.I. 281 at ¶ 5)

67

protection in relation to the large, sophisticated insurance companies who will be making claims as TPPs, and who can more easily bear the losses. Third, individual consumer claims are expected to be quite small in relation to the claims of TPPs, making consumers much less likely to file a claim. The consumer preference provides an incentive to encourage more consumer claims and helps prevent TPPs from collecting an unfair share of the total settlement fund. ,

On the other hand, it would be unfair to allow consumers to collect a disproportionate share of the settlement fund. Class counsel asserted during oral argument that, during the class period, the TPPs paid for 67% of Coumadin costs, while consumers paid for 27%, so TPPs actually bear the greater share of damages. (D.I. 267 at 62) A settlement for consumers only, if it could be achieved, would be expected to be much smaller, as the TPP claims against defendant would still exist.

One objector asserts that the TPPs lack standing to assert any claims under the antitrust laws, so should receive a much smaller share or none of the settlement fund. (D.I. 186, Shapiro Obj., citing Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912 (3d Cir. 1999)).[26]   While TPP

---

[26]Objector also cites In re Rezulin Products Liability Litigation, 171 F. Supp. 2d 299 (S.D.N.Y. 2001), for the proposition that TPPs cannot collect damages for payments made on behalf of insureds.   The case at bar can be distinguished from

68

standing was never formally challenged in the case at bar, the Third Circuit has already held that the consumer class members in this case have antitrust standing for injunctive relief. <u>In re Warfarin Sodium Antitrust Litigation</u>, 214 F.3d 395, 402 (3d Cir. 2000). The TPPs are arguably in the same position as consumers in that they allegedly paid supracompetitive prices for Coumadin or unnecessarily paid for Coumadin instead of lower-priced generic warfarin sodium. The TPPs here, as much as the consumers, could be considered "the target of DuPont's antitrust violation," in that they were the end parties absorbing the overcharges for the drugs. <u>In re Warfarin</u>, 214 F.3d at 401. In contrast, the <u>Steamfitters</u> TPPs only suffered injury (paying for treatment of smoking-related illnesses) after physical injuries were suffered by their insureds and, thus, the TPPs' harm was derivative of the consumers' harm. Even if the TPPs do not have standing to assert direct claims, they would have subrogation claims against consumer class members,[27] as Objector Shapiro acknowledged at the fairness hearing. (D.I. 267 at 12)

---

<u>Rezulin</u>, however, in that plaintiffs here allege economic injury due only to price overcharges, whereas the crux of the <u>Rezulin</u> claims was the marketing of a defective pharmaceutical product that caused physical injury or threat of physical injury to consumers.

[27]<u>See</u> <u>In re Synthroid</u>, 264 F.3d at 717 (approving settlement including class of TPPs and noting that if TPPs had not been included in distribution they could have "held back and sued [consumers] in subrogation.").

69

Inclusion of the TPPs apparently facilitated settlement, because defendant had an interest in binding all parties who had potential claims against it. (D.I. 280 at 1)  If TPPs or a subclass of consumers had been excluded from the settlement, this would have left defendant vulnerable to future lawsuits or class actions.

Similar objections have been raised to including fixed co-pay consumers in the distribution of the settlement fund. (D.I. 198, McCarty Obj.; D.I. 205, O'Kelley Obj.; D.I. 210, Bruce Obj.; D.I. 216, Galperin Obj.)  As discussed earlier, some class members argue that fixed co-pay consumers have not suffered any damages, because they pay the same for warfarin sodium regardless of whether it is brand name Coumadin or the generic version. These consumers should therefore be excluded from the settlement distribution.  While the argument has merit, ultimately the court finds that excluding the fixed co-pay consumers at this point in the litigation cannot be justified.  The fixed co-pay consumers arguably have claims for injunctive or other equitable relief, if not damages, and thus can expect some compensation for releasing their claims against defendant.  If fixed co-pay consumers were excluded altogether from the settlement, they could sue defendant for damages by invoking the "collateral source" doctrine,[28] thus

---

[28]At least one court has applied the collateral source rule to allow a consumer class to pursue the full overcharge for brand name prescription drugs in an antitrust case, even though

continuing to expose defendant to lawsuits.  Moreover, to exclude
fixed co-pay consumers now would require sending additional
notice and a new, more complicated claim form to the consumers
who have already filed claims.  (D.I. 280 at 5-6)  A new
opportunity to opt-out of the settlement would also have to be
provided.  This would further delay distribution to the rest of
the class and result in additional administrative costs.  All
these factors, plus the knowledge that all consumers who have
actually filed claims are likely to recover 100% of their
recognized losses, persuade the court that fixed co-pay consumers
should be allowed to share in the distribution of the settlement
fund.

Finally, several class members question the basis for the
15% "recognized loss" calculation imposed on claims and the use
of the same "loss" figure for all claimants.  (D.I. 186, Shapiro
Obj.; D.I. 207, HCSC Obj.; D.I. 210, Bruce Obj.; D.I. 216,
Galperin Obj.; D.I. 218, Tenn. Obj.)  After reviewing plaintiffs'
explanation for the 15% figure, the court accepts it as a
reasonable estimate of the loss each claimant has suffered due to
defendant's alleged unlawful conduct.  (D.I. 280 at 15-17)  Dr.
French made a reasonable analysis of available data to arrive at
a 25% average retail price difference between Coumadin and

---

insurance companies paid all or some of the overcharge.  See Goda
v. Abbott Laboratories, No. 01445-96, 1997 WL 156541 (D.C. Super.
Ct. Feb. 3, 1997).

generic warfarin sodium and to estimate 2.5% supracompetitive pricing for Coumadin. (Id. at 10-11, 12-15) The plaintiffs were justified in blending the 25% that would have flowed to users who switched to generic warfarin sodium with the 2.5% overcharges owed to users who remained loyal to brand name Coumadin, because determining which claimants fit into which category would have been difficult or even impossible. Also, according to defendant, the 25% price difference used by Dr. French was too high and the actual difference was closer to 17% (D.I. 238 at ¶ 17), a figure very close to the 15% "recognized loss" settled on by consumer and TPP class representatives.

Plaintiffs were also reasonable in applying the 15% loss figure to claimants from all states. It is purely speculative that claimants from indirect purchaser states could anticipate a greater recovery than claimants from other states; all claimants sought damages through consumer protection statutes, some of which also provide for punitive or treble damages. Any claim for recovery of full consideration in Tennessee or Kansas (the states that allegedly would allow recovery of the full purchase price, not just the overcharge) is also speculative since the application of this rule in the context of interstate competition is uncertain. (See D.I. 234 at 57-58)

72

Based on the above, the court finds the 15% recognized loss to be a reasonable and equitable figure with which to calculate distributions to all claimants.

The court also recognizes that the plan of allocation was agreed to by both consumer and TPP class representatives only after extensive, arm's length negotiations.  (D.I. 241 at ¶ 6; D.I. 240 at ¶ 22)  This further supports the fairness of the overall allocation and distribution of the settlement fund.

### D.   Other Objections to Settlement

The Tennessee Objectors complain that the release of claims in the Stipulation of Settlement is too broad.  (D.I. 218)   The court is unpersuaded by this argument, because the release language clearly limits it to the subject matter of this litigation, that is, to claims about "the marketing, promotion and sale of Coumadin during the Class Period that were or could have been asserted" in the current litigation.  (D.I. 172 at 7, 20-22)

To the extent that class members objected to the procedure by which objections could be raised, the court finds that objectors were given a full and fair opportunity to object to the settlement through written submissions and to appear and present argument at the fairness hearing, at which time the objectors could respond to the information or arguments presented by class

73

counsel in support of the settlement approval.  The fact that a number of detailed objections were filed by the appropriate deadline shows that adequate notice and information was available to class members and potential objectors.

In conclusion, after considering all objections to the settlement, the court finds that none of the objections raised either in writing or orally at the fairness hearing bars approval of the settlement agreement.

## VII.  ATTORNEYS' FEES AND EXPENSES

Class counsel requests that the court award an aggregate attorneys' fee in the amount of twenty-five percent (25%) of the settlement fund, plus an award of litigation costs and expenses in the amount of $832,382.84.[29]  All awards are to be paid out of the settlement fund before any distributions to the claimants.

### A.  Fee Analysis

"[A] thorough judicial review of fee applications is required in all class action settlements."  In re General Motors, 55 F.3d at 819.  In determining the fee award in a common-fund class action, the Third Circuit follows the percentage-of-the-recovery method.  See In re Cendant Corporation PRIDES Litigation, 243 F.3d 722, 734 (3d Cir. 2001); In re Prudential,

---

[29]The original request was for $835,882.84, but the reported expenses were subsequently reduced by $3500 when detailed expense records were submitted to the court.  (See D.I. 256)

74

148 F.3d at 333-334. Several nonexclusive factors are considered in determining the appropriate percentage fee: "(1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases." Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000). "The factors . . . need not be applied in a formulaic way. Each case is different, and in certain cases, one factor may outweigh the rest." Id.

## 1. Complexity of the Litigation, Size of the Settlement, and Performance of Counsel

The court need not reiterate the complex legal and factual issues and procedural difficulties of this nationwide class action and related state cases. The litigation has already progressed for over three years on multiple fronts through motions, appeals, discovery, consolidation, and lengthy settlement negotiations. In addition, the litigation was entirely initiated and pursued by class plaintiffs, not as a tag-along to a government enforcement action.

75

As a result of their efforts, the attorneys obtained a substantial cash settlement of $44.5 million on behalf of the class, and approximately two million consumers and potentially thousands of TPPs are eligible to make claims. The class counsel are well-qualified to litigate this type of complex class action, and they showed their effectiveness in the case at bar through the favorable cash settlement they were able to obtain. See Cullen v. Whitman Medical Corp., 197 F.R.D. 136, 149 (E.D. Pa. 2000) ("The single clearest factor reflecting the quality of class counsels' services to the class are the results obtained."). The court notes, however, that though the settlement is reasonable and adequate, it contained no guarantee of 100% compensation for class members who made claims, even with the 18% preference fund set aside for consumer claimants only.

The court finds that class counsel faced considerable contingent risk in pursuing this litigation. Counsel committed substantial time and resources to this litigation on a purely contingent basis, expending over 23,000 hours of work and spending $832,382.84 (not including hours and expenses incurred after the fee petition was submitted) without compensation and without any guarantee of receiving compensation. A reasonable percentage award must compensate the contingent risks borne by counsel so as to ensure that "competent counsel continue to be willing to undertake risky, complex, and novel litigation."

76

Manual for Complex Litigation 3d, § 24.121, at 191.  Class

counsel also submitted evidence that the typical range of

contingency fee agreements negotiated by health insurance

companies with their attorneys ranges from 20% to 30% of the

gross recovery, though the court does not put too much weight on

this factor. (D.I. 242); see In re Prudential Ins. Co. Am. Sales

Practice Litig., 106 F. Supp. 2d 721, 731 (D.N.J. 2000) ("the fee

percentage that likely would have been negotiated between private

parties" is one factor that courts consider in setting percentage

fee award).

Balanced against the favorable results for class members

were several substantial objections to the settlement,

particularly to the makeup of the class and the fairness of the

settlement allocation and distribution.  Class counsel could have

minimized these objections in the first instance by more

skillfully defining the class and by providing the court with

more complete documentation and analysis supporting approval of

the class and the settlement.[30]

Moreover, a thorough review of the supplemented record of

expenses also reveals the degree of duplication of effort made by

the twenty-seven different law firms involved in this litigation.

---

[30]The court ordered supplementation of the record and
further responses by all parties in interest to make up for this
deficiency.  (D.I. 273)

77

The court recognizes that counsel at some point worked to coordinate the various state and federal cases, pursuing consolidation of cases where possible and coordinating document discovery and depositions in an effort to conduct the litigation efficiently.  Nevertheless, there has been no effort on the part of the lawyers to explain why certain work was necessary and not duplicative.[31]

The court finds unpersuasive the objections lodged to the attorneys' fees themselves.  The court determines a reasonable award to the class counsel in the aggregate, and the counsel then determine how to allocate the award among themselves.  See Spicer v. Chicago Bd. Options Exch., 844 F. Supp. 1226, 1256 (N.D. Ill. 1993) ("Ideally, allocation of the fee award is a private matter to be handled among class counsel.") (citing Newberg, Attorney Fee Awards § 2.16 (1986)).  Counsel asserts that there is no pre-existing agreement as to the distribution of the fee award, but that the shared understanding is that it will be based on lodestar amounts as well as other factors. (D.I. 236 at 19; D.I. 264 at 5)  This is a private matter for the attorneys to resolve. Contrary to some objectors' concerns, there is no reason to

---

[31]The court is not inclined to order yet another supplemented record, and while the court is not questioning whether the expenses were actually incurred, the court has no way of divining whether the time and effort reflected in the consolidated expense record submitted was significantly related to the result.

78

believe that TPP and consumer counsel will collect fees in proportion to the amount of recovery for their respective clients - the settlement fund is not even allocated between TPP and consumers in such a way that would make such an attorneys' fee division possible. The court also rejects an argument that the fee should be set by auction. See In re Cendant, 264 F.3d at 284 n.56 (endorsing application of Gunter factors to determine reasonable fee even where lead counsel is selected by auction).

## 2.    Fee Awards in Other Cases

Many courts, including several in the Third Circuit, have considered 25% to be the "benchmark" figure for attorney fee awards in class action lawsuits, with adjustments up or down for significant case-specific factors. See, e.g., Manual for Complex Litigation 3d, §24.121 at 189; Lazy Oil Co., 95 F. Supp. 2d at 341; Seidman v. American Mobile Systems, 965 F. Supp. 612, 622 n. 7 (E.D. Pa. 1997); Pozzi v. Smith, 952 F. Supp. 218, 225 (E.D. Pa. 1997). Lazy Oil found a 20-27% range of fees in cases that settled for $20-30 million, and noted that the percentage of the award decreases as the size of the settlement fund increases to avoid a windfall to the attorneys. Lazy Oil Co., 95 F. Supp. 2d at 322, 342 (awarding 28% of $18.9 million settlement fund). A New York court found that awards range from 20-30% with a benchmark of 25% for class action settlements up to $50 million. In re NASDAQ Market Makers Antitrust Litigation, 187 F.R.D. 465,

79

486 (S.D.N.Y. 1998). Another court found that as recoveries increased from $50 million, the range of attorney's fees decreased, with fees falling in a 13-20% range for $51-75 million recoveries and a 6-10% range (or lower) for "megafund" recoveries of $75-200 million. <u>In re Domestic Air Transp. Antitrust Litig.</u>, 148 F.R.D. 297, 350-1 (N.D. Ga. 1993). A Minnesota court awarded 22.5% of $50 million recovery after eight years of litigation and extensive discovery and other proceedings, equivalent to a 2.5 lodestar multiplier. <u>In re Workers' Compensation Ins. Antitrust Litig.</u>, 771 F. Supp. 284 (D. Minn. 1991).[32]

### 3.    Reasonable Fee

Based on the factors discussed above, the court finds that a 22.5% percentage-of-recovery award is a reasonable attorneys' fee. The complexity of the case, the relatively advanced stage of litigation, the substantial cash settlement, the large number of hours expended by plaintiffs' attorneys on a contingent basis, and the fees awarded in other class actions all support a substantial fee award. Nevertheless, the duplication of effort among the twenty-seven law firms involved in this litigation and the initially inadequate submissions to the court in support of

---

[32]Contrary to one objector's suggestion, the case at bar is not a "megafund" case that warrants significant downward departure from the typical 20-30% fee range. <u>See, e.g.</u>, <u>In re Prudential</u>, 962 F. Supp. at 585.

settlement approval warrant a modest reduction from the 25%
benchmark fee award.

### 4.   Lodestar Cross-check

The Third Circuit suggests that the district court cross-
check the percentage award against the "lodestar" award to help
ensure the reasonableness of the fee.   Gunter, 223 F.3d at 195
n.1.   The lodestar award is calculated by multiplying the number
of hours reasonably worked on a client's case by a reasonable
hourly billing rate for such services based on the given
geographical area, the nature of the services provided, and the
attorney's experience.   Id.   When performing the lodestar
analysis as a cross check on the fee award, the court may find it
sufficient to review time summaries, rather than the actual
billing records.   Id. at 200 (citing In re Prudential, 148 F.3d
at 332 n. 107).   Counsel in the case at bar submitted affidavits
from each of the twenty-seven law firms involved in the
litigation detailing the number of hours and hourly billing rate
for each lawyer, paralegal, or law clerk who worked on the case.
(D.I. 239, Ex. B)   Each affidavit verified that an unenhanced,
customary billing rate was used.   Based on a review of these
affidavits, the court finds that the submitted hours and hourly
rates are reasonable, with the hourly rates appropriately varying
based on position and experience.

81

When the aggregate lodestar (i.e., $7.54 million) is compared to the attorneys' fee award of 22.5% of the settlement fund (i.e., $10.01 million), the fee constitutes a lodestar multiplier of 1.33, well under the multiplier cap of 3 recently suggested in <u>In re Cendant PRIDES</u>, 243 F.3d at 742. The Third Circuit has also recognized that multipliers in the range of one to four are frequently awarded in common fund cases. <u>In re Prudential</u>, 148 F.3d at 341. A modest enhancement of the lodestar amount is appropriate in this case for some of the same reasons supporting the 22.5% percentage-of-recovery fee – the risk of nonpayment and the complexity and duration of the litigation. <u>See id.</u> at 340. The court finds that the calculated lodestar fee supports the reasonableness of a 22.5% percentage-of-recovery fee award in this case.

## B.    Litigation Costs and Expenses Analysis

Class counsel also seek an award of litigation costs and expenses in the amount of $832,382.84 to be paid out of the gross settlement fund before distribution to claimants. After a thorough review of the detailed expense records submitted by class counsel (D.I. 257), the court finds that an award of $832,382.84 in expenses is fair and reasonable.

82

## C.   Administration Costs

The settlement administrator affirms that $2,058,294.60 in settlement administration costs had been incurred through May 31, 2002, including $1,531,106 for publication of notice to the class.   (D.I. 281 at ¶ 6)   The administrator estimates that an additional $137,875 in costs will be incurred to complete administration of the settlement.   (Id.)   The Stipulation of Settlement provides that all administration costs be paid out of the settlement fund.   The court finds that the administration costs incurred to date are fair and reasonable.   If the additional costs exceed $137,875 by more than 10%, the administrator shall submit an explanation for the additional requirements to the court for approval.

## VIII. Motions to Intervene

Objectors HCSC (D.I. 254), Bradley et al. (D.I. 212), Cleusman et al. (D.I. 218), and McCarty (D.I. 200) filed motions to intervene.   The movants' primary motivation in filing these motions to intervene is to preserve their rights to object to the settlement and appeal settlement approval.   Intervention for these purposes is unnecessary in the Third Circuit.   Objecting class members are eligible to appeal from any final order entered by the court.   See Carlough v. Amchem Prods., 5 F.3d 707, 710 (3d Cir. 1993).   In addition, the court provided every class member who did not opt out with the opportunity to present argument or

83

evidence of the unfairness of the settlement in writing and/or orally at the fairness hearing.  This comported with Third Circuit law that "an objector . . . is entitled to an opportunity to develop a record in support of his.contentions by means of cross examination and argument to the court."  <u>Greenfield v. Villager Industries, Inc.</u>, 483, F.2d 824, 833 (3d Cir. 1973).

Based on the above, the court finds no reason to allow intervention under Fed. R. Civ. P. 24(a)(2) or (b)(2).  The moving objectors were adequately represented in this litigation by the named plaintiffs, and intervention at this stage of the litigation would serve no purpose except to potentially delay implementation of the settlement agreement.  Thus, all motions to intervene shall be denied.

## IX. CONCLUSION

After reviewing the submissions of the parties, the objections, and the record evidence, the court finds the proposed class meets the requirements of Rule 23 and therefore certifies the proposed class for purposes of settlement.  The court also finds the stipulated settlement is fair, reasonable, and adequate and grants approval under Rule 23(e).  The court awards attorneys' fees in the amount of 22.5% and expenses in the amount of $832,382.84.  Finally, all motions to intervene shall be denied.  An appropriate order shall issue.

84

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

In re WARFARIN SODIUM            )
ANTITRUST LITIGATION             )
                                 )
                                 )    MDL No. 98-1232-SLR
This document relates to:        )
All Actions.                     )

O R D E R

At Wilmington, this 30th day of August, 2002, consistent
with the opinion issued this same day;

IT IS ORDERED that:

1.    Plaintiffs' motion for final approval of a proposed
class action settlement agreement (D.I. 233) is granted.  The
following class is certified for purposes of settlement:

> All consumers and Third Party Payors in the United
> States who purchased and/or paid all or part of
> the purchase price of Coumadin dispensed pursuant
> to prescriptions in the United States during the
> period March 1, 1997 through and including August
> 1, 2001 ("Class Period").  Excluded from the Class
> are Defendant and any of its officers and
> directors, and any governmental entity.  "Third
> Party Payor" shall mean any non-governmental
> entity that is (i) a party to a contract, issuer
> of a policy, or sponsor of a plan, which contract,
> policy or plan provides prescription drug coverage
> to natural persons, and is also (ii) at risk,
> pursuant to such contract, policy or plan, to
> provide prescription drug benefits, or to pay or
> reimburse all or part of the cost of prescription
> drugs dispensed to natural persons covered by such
> contract, policy, or plan.

8\30\02

The parties are hereby directed to implement and consummate the Stipulation of Settlement (D.I. 172) according to its terms and provisions. The parties are authorized to agree to and adopt such amendments and modifications to the Stipulation as (i) shall be consistent in all material respects with this final order and (ii) do not limit the rights of the class members.

2.    The terms of the Stipulation, including all exhibits thereto, and of this final order and judgment, shall forever be binding on, and shall have res judicata and claim preclusive effect in, all pending and future lawsuits maintained by or on behalf of, plaintiffs and all other class members, as well as their heirs, executors, administrators, successors, and assigns.

3.    Without affecting the finality of this order and judgment, the court retains continuing and exclusive jurisdiction over all matters relating to the administration, consummation, enforcement, and interpretation of the Stipulation and this order and judgment, to protect and effectuate this final order and judgment, and for any other necessary purpose.

4.    Plaintiffs' motion for an award of attorneys' fees and expenses (D.I. 235) is granted, with attorneys' fees awarded in the amount of 22.5% of the settlement fund and expenses in the amount of $832,382.84 to be paid to the Co-Chairs of the Executive Committee out of the settlement fund in accordance with the terms of the Stipulation of Settlement, together with

2

interest thereon from the date of entry of this Final Order and Judgment to the date of payment out of the Settlement Fund at the rate earned by the Settlement Fund during such period. Co-Chairs of the Executive Committee shall allocate and distribute such awards among plaintiffs' counsel.

5.   Objectors' HCSC (D.I. 254), Bradley et al. (D.I. 212), Cleusman et al. (D.I. 218), and McCarty (D.I. 200) motions to intervene are denied.

6.   Objector Shapiro's motion to strike document (D.I. 261) and motion to require lead counsel to disclose fee arrangements (D.I. 262) are denied.

7.   Objector Hansen's motions for enlargement of time to file objection (D.I. 246, D.I. 247) are denied.

8.   This action is hereby dismissed, on the merits, with prejudice, against the plaintiffs and all other class members.

_____
United States District Judge