IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re WARFARIN SODIUM ANTITRUST LITIGATION | ) ) )  MDL 98-1232 (SLR) |
| This document relates to:  All Actions. | ) ) ) |

**DECLARATION OF JENNIFER W. SPRENGEL IN SUPPORT
OF CLASS COUNSEL'S MOTION FOR DISBURSEMENT OF FUNDS**

JENNIFER W. SPRENGEL declares as follows:

1. I am a partner with Miller Faucher and Cafferty LLP. My firm and the firm of Labaton Sucharow & Rudoff LLP are the Co-Chairs of the Executive Committee of Counsel for Plaintiffs in the above-captioned litigation (the "Action"). I make this declaration in support of the accompanying Motion for Disbursement of Funds and proposed distribution order, which will govern the distribution of Settlement Fund amounts to eligible claimants. If called as a witness, I can competently testify to the facts stated herein.

2. The Action arose out of allegations that DuPont Merck Pharmaceutical Company, now known as DuPont Pharmaceuticals Company, engaged in an unlawful scheme to, *inter alia*, boost sales and profits of its warfarin sodium product, Coumadin, by fostering unwarranted concerns over the safety and efficacy of less expensive generic substitutes, thereby discouraging their use.

3. On August 30, 2002, the Court issued an Opinion and Order holding that a proposed nationwide class of consumers and third-party payors of Coumadin (the "Class") satisfied requirements for certification as a settlement class, and a proposed $44.5 million all cash settlement of the Action (the "Settlement") was fair, reasonable and adequate. *See In re Warfarin Sodium Antitrust Litigation*, 212 F.R.D. 231, 252, 258, 262-63 (D. Del. 2002) (the "Settlement Approval Order").

4. On December 8, 2004, in deciding four appeals by objectors to the Settlement, the United States Court of Appeals for the Third Circuit affirmed the Settlement Approval Order in all respects. *See In re Warfarin Sodium Antitrust Litigation*, 391 F.3d 516 (3d Cir. 2004). The period within which to file a writ of *certiorari* expired in March 2005. Because the appeals to the Settlement Approval Order threatened the very existence of the Settlement itself, we had instructed Complete Claim Solutions, Inc. (the "Claims Administrator") to cease claims processing activities in 2002 once the appeals were filed (the "Stop Work Instruction"). Immediately after the Settlement Approval Order became final and non-appealable in 2005, we instructed the Claims Administrator to resume its work in processing claims of would-be Class members.

5. The Claims Administrator has recently completed its review and processing of all claims.

6. Subject to Court approval, the Claims Administrator has calculated, under our direction, the Recognized Losses for eligible consumer and third-party payor ("TPP") claimants. Applying the eligibility and payment criteria discussed herein, we are informed by the Claims Administrator that there are 47,913 eligible consumer claimants with Recognized Losses of $4,386,500.86, and 943 eligible TPP claimants with Recognized Losses of $79,637,103.38. Using these calculations, approximately $1,480,000.00 of the "Preferential Fund" (*i.e.*, that portion of the Net Settlement Fund set aside for consumer claims in the Settlement's Court-approved Allocation and Distribution Plan) will be available after all consumer claims are satisfied; this amount will be added to the remainder of the Net Settlement Fund for payment of the Recognized Loss of TPPs on a *pro rata* basis.

7. We instructed the Claims Administrator to include among the eligible claims 775 consumer claims (with an aggregate Recognized Loss of $76,066.38) and 80 TPP claims (with an aggregate Recognized Loss of $5,272,286.96 ) received after the filing deadline of April 30, 2002.

8. We instructed the Claims Administrator to include among the eligible claims those filed by consumers who failed to include proof-of-purchase data with their Proof of Claim forms. The Claims Administrator had planned on sending deficiency letters to these claimants in 2002 but did not do so because of our Stop Work Instruction. Although the Claims Administrator was authorized to continue processing claims in the Spring of 2005, in light of the lengthy period of time during which the Settlement was in limbo, we consulted with the Claims Administrator and instructed them to waive the "proof" requirement. We did not want to penalize consumers who may have lost or discarded their purchase data during the period while the appeals were pending.[1]

9. We instructed the Claims Administrator to calculate certain consumer claims to receive a "minimum payment" of $20.00. This proposed minimum payment applies to two subsets of consumer claims. First, subject to Court approval, it applies to the 834 consumer claims that did not list their Coumadin purchases on the Proof of Claim form. This payment would provide a *de minimis* benefit to consumers who took the time to fill out and send in a Proof of Claim form, but who inadvertently left the purchase amount blank. In accordance with the waiver of "proof" discussed above, we did not want to penalize these consumers. Second, subject to Court approval, the minimum $20.00 payment applies to 8,456 consumer claims in which the claimant's Coumadin purchases, per his/her Proof of Claim form, resulted in a Recognized Loss of less than $20.00. Because Coumadin is a "maintenance" drug, usually taken for a longer duration than an acute-care

---

[1] Consumers who filed claims considered to be "high" (*i.e.*, in excess of $7,000.00) were separately reviewed and audited by the Claims Administrator. Consumers who failed to support their "high" claims are not included within the group described herein. *See also* the accompanying affidavit of Thomas R. Glenn in support of proposed plan of distribution of the Settlement Fund to eligible claimants at ¶¶ 7-9.

3

drug, and thus very likely to result in costs in excess of $20.00, we did not anticipate claims of such small amounts. Thus, as with the Proof or Claim forms with the purchase amount left blank, our concern was that many of these consumers may have misunderstood or misread the Proof of Claim form. Rather than having the Net Settlement Fund incur additional costs related to further mailings or other investigatory efforts by the Claims Administrator, we believed that the more prudent, equitable and administratively convenient approach was to provide these "low" claiming consumers a minimum $20.00 payment.

10.     Making these minimum payments increases the total number of consumer Class members sharing in the Settlement and increases the aggregate Net Settlement Fund payment to consumers, while still allowing (a) all other consumer Class members to receive 100% of their actual Recognized Loss and (b) approximately $1.48 million of the consumer "Preferential Fund" to be added to the remainder of the Net Settlement Fund for payment of the Recognized Loss of TPPs.

I declare under penalty of perjury pursuant to the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Executed December 13, 2005 at Chicago, Illinois.

JENNIFER W. SPRENGEL