UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

In re WARFARIN SODIUM ANTITRUST LITIGATION

This document relates to: All Actions.

: MDL 98-1232 (SLR)

AFFIDAVIT OF THOMAS R. GLENN
IN SUPPORT OF PROPOSED PLAN OF DISTRIBUTION OF
THE SETTLEMENT FUND TO ELIGIBLE CLAIMANTS

STATE OF FLORIDA        )
                        ) ss:
COUNTY OF PALM BEACH    )

THOMAS R. GLENN, being duly sworn, deposes and says:

1. I am the Senior Vice President and Chief Operating Officer of Complete Claim Solutions, Inc. ("CCS"), the settlement administrator in the above-captioned litigation (the "Action"). I am over 21 years of age and am not a party to the Action. I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

## EXECUTIVE SUMMARY

2. In connection with the settlement of the Action (the "Settlement"), Class counsel retained CCS to: (i) provide notice to the potential members of the Settlement class (the "Class"); (ii) process the claims of Class members; (iii) calculate Recognized Losses (as defined by the Settlement), and; (iv) distribute the Net Settlement Fund (as defined by the Settlement) to Class members with valid claims. CCS addressed item (i) in connection with the Settlement approval process in 2002. I submit this affidavit to address items (ii) through (iv).

3. With respect to item (ii), this is to inform the Court that CCS has completed processing the claims of potential Class members. The July 29, 2005 affidavit of Dawn E. Addazio, CCS's President, stated at ¶3 that CCS would "report further to the Court regarding the final disposition of claims in this administration."[1] This affidavit is CCS's report on the final disposition of claims. CCS has received and processed over 1,000 claims from or on behalf of third-party payors ("TPPs"), representing over 46,160 TPP Class members, and over 48,600 claims from or on behalf of consumers. After eliminating duplicative and misfiled claims, CCS has determined that 99% of the TPP claims (representing over $79 million in Coumadin Recognized Losses) are eligible for payment. Likewise, using the eligibility and payment criteria discussed below, over 98% of the received consumer claims (representing over $4.3 million in Coumadin Recognized Losses) are eligible for payment. I further discuss the final disposition of claims in this administration in ¶¶6-13 below.

4. With respect to item (iii), CCS has calculated, under the direction of Class counsel, the Recognized Losses for eligible consumer and TPP claimants. Based on the aggregate value of eligible consumer claims processed, using the eligibility and payment criteria discussed below, the total Recognized Loss for consumers does not exceed that portion of the Net Settlement Fund identified as the "Preferential Fund" set aside for consumer claims in the Settlement's Court-approved Allocation and Distribution Plan. Thus, pursuant to the Allocation and Distribution Plan, consumer Class members will receive 100% of their Recognized Loss upon distribution of the Net Settlement Fund. The unexpended portion of the Preferential Fund – nearly $1.5 million – will be added to the remainder of the Net Settlement Fund for payment of the Recognized Loss

---

[1] *See* the Affidavit of Dawn E. Addazio Regarding the Status of the Settlement Fund and in Support of CCS's Supplemental Application for Settlement Administration Costs, annexed as Exhibit I to the Joint Declaration of Jennifer W. Sprengel and Bernard Persky in Support of Supplemental Application for Attorneys' Fees and Reimbursement of Expenses, submitted August 8, 2005. (D.I. 326)

of TPPs. For TPP Class members, using the eligibility and payment criteria discussed below, CCS has calculated each eligible TPP Class members' *pro rata* share of the Net Settlement Fund. CCS estimates that TPP Class members will receive approximately 35% of their Recognized Loss upon distribution of the Net Settlement Fund. I further discuss the issues concerning the calculation of Recognized Losses in ¶¶14-19 below.

5. With respect to item (iv), the distribution of the Net Settlement Fund, CCS will be able to issue checks to eligible consumer claimants upon the entry of a Distribution Order. I further discuss the timing of the distribution of the Net Settlement Fund in ¶20 below.

## CCS'S REPORT ON THE FINAL DISPOSITION OF CLAIMS

6. CCS received and processed 1,073 claims from or on behalf of TPPs, representing over 46,160 Class members, and 48,693 claims from or on behalf of consumers. Claims not initially determined to be "eligible" fell into one of two categories: (1) "deficient" claims, meaning that relevant information on a claimant's Proof of Claim form was missing, and; (2) "ineligible" claims, meaning the claim was duplicative of a previously filed claim or that the information provided on the Proof of Claim form showed that the claimant was not a member of the Class.

7. Except as described below (see ¶13), CCS sent letters to all claimants (or, as applicable, to their agents or their "record-keeping entities" (*i.e.*, prescription benefit managers or other agencies that file claims on behalf of multiple TPPs)) identifying deficient or ineligible claims and inviting claimants to cure the deficient or ineligible conditions. After consulting Class Counsel, CCS also sent letters to consumer claimants whose stated Coumadin purchases seemed unusually low (less than $25.00) or unusually high (greater than $7,000.00).

3

8. The concern with "low" claims was that the consumer claimant might have listed only one of several Coumadin purchases or co-payments during the Class Period. Because we understand that Coumadin is a "maintenance" drug rather than an acute-care drug, it was anticipated that virtually all consumer Class members would have claims for multiple purchases. For "high" claims, the main concern was fraud. It is not unusual for CCS to receive a small number of forms with claimed amounts that are far above the average submitted claim in a given administration. When this occurs, CCS's standard practice is to contact the claimant and request additional information or documentation to support the claim. Often this audit function results in the would-be claimant ceasing the pursuit of the claim. There were several "high" claims in this administration that followed this paradigm.[2]

9. Another concern with "high" claims was the possibility that Coumadin purchases outside the Class Period were included, especially where the claimant noted on the Proof of Claim form that he/she began using Coumadin before the Class Period began and/or made some notation on the Proof of Claim that he/she was "currently taking" Coumadin. Consumer claimants who failed to adequately support their "high" claim amounts had their claims deemed ineligible.

10. CCS sent over 3,300 deficiency, ineligibility, and high/low-amount letters to consumer and TPP claimants. CCS also called certain consumer and TPP claimants in an effort to resolve deficient or ineligible conditions. For claims that remained unresolved, CCS sent claimants Final Deficiency and Final Ineligibility letters. All such "final" letters were sent via FedEx 2-day delivery to TPPs and via First Class U.S. Mail to consumers. Samples of the full

---

[2] CCS also engaged in an audit function with respect to TPP claims. In the aggregate, CCS audited roughly 6% of eligible TPP claims filed, representing 4% of the aggregate amount claimed by TPPs.

4

complement of letters sent to claimants in this administration are annexed hereto as Exhibit A, as follows:

| **Letters to TPP Claimants, Their Agents and/or Record-Keeping Entities ("RKE")** ||
|---|---|
| A-1 | Request for Information, Information Missing (TPP, Agent, and RKE) |
| A-2 | Notice of Ineligibility, Not a Class Member (Consumer filing on TPP Claim form) |
| A-3 | Notice of Ineligibility, Not a Class Member (TPP) |
| A-4 | Notice of Ineligibility Letter, Duplicative Claim (TPP, Agent, and RKE) |
| A-5 | Notice of Partial Ineligibility, Claim Partially Duplicative of Claim filed by another Agent/RKE for same Administrative Services Only entity ("ASOs") (Agent or RKE) |
| A-6 | Notice of Partial Ineligibility, Agent/RKE's Claim Partially Duplicative of Claim filed by a TPP Class Member (Agent or RKE) |
| A-7 | Request for Additional Information, Purchase Data (TPP, Agent, and RKE) |
| A-8 | Final Request for Information, Information Missing (TPP, Agent, and RKE) |
| A-9 | Final Request for Additional Information, Purchase Data (TPP, Agent, and RKE) |
| A-10 | Final Disposition, Amount Missing (TPP, Agent, and RKE) |
| **Letters to Consumer Claimants** ||
| A-11 | Notice of Ineligibility, Amount Missing |
| A-12 | Request for Information, Signature Missing |
| A-13 | Request for Additional Information, Low Claim Amount |
| A-14 | Request for Additional Information, High Claim Amount |
| A-15 | Notice of Ineligibility, Duplicative Claim |
| A-16 | Notice of Ineligibility, Coumadin Purchased Outside Class Period |
| A-17 | Acknowledgement of Withdrawal |
| A-18 | Final Notice of Ineligibility, Fraudulent Claim |

11. CCS reviewed and processed all responses from claimants, shifting claims as necessary to the appropriate category (eligible, deficient or ineligible).

12. In total, CCS received 130 TPP claims deemed ineligible. Of these, 86 claims were duplicative of identical eligible claims and 35 claims were filed by consumers who mistakenly used the TPP Proof of Claim form.[3] After accounting for consumer and duplicative claims, only 9 of the 130 ineligible claims submitted are for entities that will not share in the Net Settlement Fund (seven claimants left the purchase amount blank and did not correct the deficiency despite having been given multiple opportunities to do so, and two claimants made no purchases during the Class period).

13. Of the 48,693 claims from or on behalf of consumers, 1.6%, or 780 claims, were deemed ineligible. Included in this group are: consumer claimants who filed duplicative claims (corresponding eligible claims will be paid); consumer claimants who are not members of the Class (*e.g.*, for Coumadin purchases outside the Class Period); consumer claimants who withdrew their claims in writing; consumer claimants who failed to adequately support their "high" claim amounts; and consumers who filed fraudulent claims. This figure also includes 112 claimants for whom an address cannot be found[4], 20 of whom are deceased according to the address research firm engaged by CCS[5].

---

[3] CCS processed these 35 claims as consumer claims; no consumers were penalized for having filed their claims on the wrong Proof of Claim form.

[4] Presumably due to the long period of time that passed while the appeal was pending, over 350 deficiency or ineligibility letters were returned to CCS by the U.S. Postal Service as "undeliverable" or "forwarding address order expired." On three separate occasions, CCS sent groups of undeliverable addresses to an address research firm to attempt to ascertain the claimant's last best known mailing address. CCS re-mailed the appropriate letter to the claimant's last best known address. Despite these efforts, CCS was unable to track down the claimants mentioned above.

[5] In the event CCS sends a check to a Class Member who has subsequently died and to whom we have not previously sent correspondence, upon request by next of kin or an administrator of the estate, CCS will reissue the check.

## CALCULATION OF RECOGNIZED LOSSES

14. In accordance with the Settlement and its Allocation and Distribution Plan, a claimant's "Recognized Loss" for purchases of Coumadin during the Class Period is valued as follows: payments for Coumadin minus amounts received as reimbursements, discounts or rebates multiplied by 15%. Eighteen percent (18%) of the Net Settlement Fund was designated to satisfy the Recognized Loss of consumers only (the "Preferential Fund"). The Settlement included a contingency plan to address the situation in which the Preferential Fund was not enough to satisfy all eligible consumer claims, but CCS has calculated that 100% of the Recognized Loss of consumers indeed will be satisfied from the Preferential Fund. CCS has further calculated that there in fact will be an unexpended portion of the Preferential Fund to be added to the remainder of the Net Settlement Fund for payment of the Recognized Loss of TPPs on a *pro rata* basis.

15. Subject to Court approval, CCS has calculated, under the direction of Class counsel, the Recognized Losses for eligible consumer and TPP claimants. Applying the eligibility and payment criteria discussed herein, there are 47,913 eligible consumer claimants with Recognized Losses of $4,386,500.86, and 943 eligible TPP claimants (representing over 45,750 TPP Class members) with Recognized Losses of $79,637,103.38. Using these calculations, nearly $1.5 million of the Preferential Fund will be available after all consumer claims are satisfied; this amount will be added to the remainder of the Net Settlement Fund for payment of the Recognized Loss of TPPs on a *pro rata* basis

16. Included among the eligible claims are 775 consumer claims (with an aggregate Recognized Loss of $76,066.38) and 80 TPP claims (with an aggregate Recognized Loss of $5,272,286.96 ) received after the filing deadline of April 30, 2002.

17. Also included among the eligible consumer claims are those filed by consumers who failed to include proof-of-purchase data with their Proof of Claim forms (other than those who failed to support their "high" claims, as discussed in ¶13, above). CCS had planned on sending deficiency letters to these claimants in 2002. However, because the appeal of the Order approving the Settlement threatened the existence of the Settlement itself, Class counsel instructed CCS to cease claims administration activities. Once the Third Circuit's December 2004 affirmance of the Settlement Approval Order was no longer subject to appellate review, Class counsel instructed CCS to resume claims administration activities. In light of the lengthy period of time during which the Settlement was in limbo, CCS consulted with Class counsel earlier this year and was directed to waive the "proof" requirement. Class counsel informed CCS that they did not want to penalize consumers who may have lost or discarded their purchase data during the period while the appeals were pending.

18. Also included in the Recognized Loss calculations for eligible consumer claimants are "minimum payments" of $20.00 proposed by Class counsel for two subsets of consumer claims: (1) the 8,456 consumer claims in which the claimant's Coumadin purchases, per his/her Proof of Claim form, resulted in a Recognized Loss of less than $20.00; and (2) the 834 consumer claims that did not list their Coumadin purchases on the Proof of Claim form. Making these minimum payments increases the total number of consumer Class members sharing in the Settlement and increases the aggregate Net Settlement Fund payment to consumers from $4,293,976.92 to $4,386,500.86, while still allowing all other consumer Class members to receive 100% of their actual Recognized Loss.

19. Reports identifying different categories of claimants and the aggregate amounts claimed per category (if available) are annexed hereto as Exhibit B, as follows:

| Claim Categories |||
|---|---|---|
| Exhibit | Claim Type | Aggregate Recognized Loss |
| B-1 | Eligible Consumer Claims | $4,386,500.86 |
| B-2 | Late Consumer Claims | $76,066.38 |
| B-3 | Ineligible Consumer Claims | n/a |
| B-4 | Eligible TPP Claims | $79,637,103.38 |
| B-5 | Late TPP Claims | $5,272,286.96 |
| B-6 | Ineligible TPP Claims | n/a |

## DISTRIBUTION OF THE NET SETTLEMENT FUND

20. Upon approval of the Court, CCS will promptly generate checks and mail to eligible consumer and TPP claimants their appropriate share of the Net Settlement Fund as identified in Exhibits B-1 and B-4. CCS anticipates the checks would begin to be mailed within 10 business days of being informed of Court approval.

_____
Thomas R. Glenn

Sworn to before me on
this 5th day of December, 2005

_____
Notary Public



ERIC P. LACHANCE
MY COMMISSION # DD 490949
EXPIRES: November 25, 2009
Bonded Thru Notary Public Underwriters

9